IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-02664-RM-KLM

BPS, a Minor and Disabled Person
KATRINA L. STEWART, his Parent and Next Friend, and
JOHN P. STEWART, his Parent and Next Friend,

      Plaintiffs,

v.

BOARD OF TRUSTEES FOR COLORADO SCHOOL FOR THE DEAF AND BLIND,
COLORADO SCHOOL FOR THE DEAF AND BLIND,
LOUIS TUTT, Individually and in his Official Capacity as Principal for the Colorado School
for the Deaf and Blind, and
DOES 1-10, who are unknown persons,

      Defendants.
_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

      This matter is before the Court on Defendant Colorado School for the Deaf and the

Blind's and Defendant Board of Trustees for the Colorado School for the Deaf and the

Blind's **Motion to Dismiss** [Docket No. 16; Filed December 28, 2012] and Defendant Louis

Tutt's **Motion to Dismiss** [Docket No. 17; Filed December 28, 2012] (collectively, the

"Motions"). On February 8, 2013 Plaintiffs filed Responses [#25, #26, #27, #28]. On March

22, 2013, Defendants filed Replies [#47, #48]. The Motions are thus ripe for review.

Pursuant to 28 U.S.C. § 636(b)(1) and D.C.COLO.LCivR 72.1C.3., the Motions are referred

to this Court for recommendation [#41]. Having reviewed the entire case file and being

sufficiently advised, the Court **RECOMMENDS** that the Motions [#16, #17] be **GRANTED**.[1]

## I.  Summary of the Case

In ruling on a motion to dismiss, the Court construes the factual allegations in the light most favorable to Plaintiffs. *See Green v. Lexis-Nexis*, 513 F. App'x 772, 773 (10th Cir. 2013) (citing *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). Plaintiffs allege as follows:

The events giving rise to the present action took place between 2009 and 2012 at the Colorado School for the Deaf and the Blind (the "School"). Plaintiff BPS is visually impaired, has severe learning disabilities, and at all times relevant to the present action was a minor and a student at the School. *Compl.* [#1] at 3. Plaintiffs Katrina L. Stewart and John P. Stewart are Plaintiff BPS's parents and next friends. *Id.* [#1] at 2. Defendant School is a governmental entity located in Colorado Springs, Colorado. *See* C.R.S. § 22-80-102(1)(a). Defendant School is organized as a "body corporate," "is declared to be "one of the educational institutions of the state of Colorado," and "has for its object the education of the children of  the state who, by reason of the impairment of their sense of hearing or sight, cannot be advantageously educated in the other schools or educational institutions of the state." C.R.S. § 22-80-102(1)(a)-(b). Defendant Board of Trustees for the School (the "Board") is a governmental entity within the Colorado Department of Education ("CDOE"). C.R.S. § 22-80-103(1)(a). The Board has powers and duties relating to the governance and operation of the School. *See generally* C.R.S. § 22-80-103. Defendant Louis Tutt ("Tutt") was, at all times relevant to the present action, employed by the Board

---

[1] As discussed below, Plaintiffs' third claim for relief will remain if this Recommendation is adopted in full.

as the principal of the School.  *Compl.* [#1] at 2.

, In February 2010, another student, CS, sexually assaulted Plaintiff BPS while on School premises.  *Compl.* [#1] at 3.  On or around May 5, 2011, CS met with a School employee and confessed that, at various times from 2009 to 2011, he had sexually assaulted five students while on School grounds.  *Id.* at 4.  One of the students that CS confessed to sexually assaulting was Plaintiff BPS.  *Id.*  Barbara Meese ("Meese"), the current principal of the School, reported CS's confession to the Colorado Department of Human Services ("CDHS").  *Id.* at 4.  CDHS then contacted the Colorado Springs Police Department ("CSPD").  *Id.*  On or around May 18, 2011, CSPD began investigating the sexual assaults that CS had allegedly perpetrated.  *Id.*  During the course of its investigation, CSPD interviewed a number of School personnel.  *Id.* at 4-5.  These interviews revealed a significant amount of confusion among School personnel regarding the existence of and meaning of the School's policies and procedures that governed the reporting of criminal or sexual acts by students.  *Id.* at 5-6.  Specifically, some personnel considered criminal or sexual acts by students to be confidential and not subject to mandatory reporting; others considered it a duty to report to their supervisor all criminal or sexual acts by students.  *Id.* at 5.  CSPD's investigation also indicated that Defendant Tutt did not prepare any incident reports or other documentation concerning CS's alleged sexual assault of Plaintiff BPS or any other student at the School.  *Id.* at 6.

Despite knowledge of multiple incidents of sexual assault at the School and despite knowledge that students at the School faced a continuing threat of sexual assault, Defendants failed to report any conduct or risk to Plaintiff BPS's parents or to law-enforcement authorities.  *Id.*  Additionally, Defendants failed to adopt or implement policies

and procedures to lessen such risk or to protect from such risk Plaintiff BPS and other students at the School.  *Id.*

Arising from these allegations, Plaintiffs state four claims for relief.  *See generally Id.* at 6-15.   First, Plaintiffs allege that Defendant Tutt, in his individual and official capacities, violated 42 U.S.C. § 1983 by failing to adopt policies aimed at preventing sexual assault of Plaintiff BPS.  *See id.* at 6-9.  Second, Plaintiffs allege that Defendant School and Defendant Board violated 42 U.S.C. § 1983 by failing to adopt policies aimed at preventing sexual assault of Plaintiff BPS.  *See id.* at 9-11.   Third, Plaintiffs allege that Defendant School and Defendant Board violated Title IX, 20 U.S.C. §§ 1681-88, by exhibiting deliberate indifference to sexual harassment of Plaintiff BPS, thereby creating a hostile educational environment for Plaintiff BPS.  *See id.* at 11-13.   Fourth, Plaintiffs allege that Defendants[2] violated Title II of the Americans with Disabilities Act (the "ADA"), and also the Rehabilitation Act (the "RA"), by fostering a hostile educational environment that excluded Plaintiff BPS from participation in and the benefits of a public program.  *See id.* at 13-15.

Defendants responded with the Motions [#16, #17] at issue. First, Defendants argue that Plaintiffs' Section 1983 claims against the School, the Board, and Defendant Tutt in his official capacity should be dismissed as barred by the Eleventh Amendment to the United States Constitution, *see Motions* [#16] at 3-10; [#17] at 3-5, and that Plaintiffs' Section 1983 claims against Defendant Tutt in his individual capacity should be dismissed

---

[2]  In his Motion [#17], Defendant Tutt avers that his counsel spoke with Plaintiffs' counsel in an attempt to identify the Defendants against whom Plaintiffs assert their fourth claim.  Defendant Tutt indicates that Plaintiffs' counsel "was unable to conclusively state Plaintiff's intent as to the applicable Defendants under this claim." *Motion* [#17] at 12 n.5.  Accordingly, for purposes of this Recommendation, the Court assumes that Plaintiffs' fourth claim is brought against all Defendants.

as barred by qualified immunity, *see Motion* [#17] at 11-12.  Second, Defendants argue that

Plaintiffs' ADA and RA claims against Defendant School, Defendant Board, and Defendant

Tutt in his official capacity should be dismissed as barred by the Eleventh Amendment and

for failure to state a claim, *see Motions* [#16] at 11-13, 15-18; [#17] at 5-11, and that

Plaintiffs' ADA and RA claims against Defendant Tutt in his individual capacity should be

dismissed because Defendant Tutt in his individual capacity is not a proper party, *see*

*Motion* [#17] at 12-13.  Defendants do not address Plaintiffs' Title IX claim.

## II.  Standard of Review

### A.    Rule 12(b)(1)

The purpose of a motion to dismiss pursuant to Rule 12(b)(1) is to test whether the

Court has jurisdiction to properly hear the case before it.  Because "federal courts are

courts of limited jurisdiction," the Court must have a statutory basis to exercise its

jurisdiction. *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002); Fed. R. Civ. P. 12(b)(1).

Statutes conferring subject-matter jurisdiction on federal courts are to be strictly construed.

*F & S Const. Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964).  "The burden of

establishing subject-matter jurisdiction is on the party asserting jurisdiction."  *Id.* (citing

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

A motion to dismiss pursuant to Rule 12(b)(1) may take two forms:  facial attack or

factual attack. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).  When reviewing

a facial attack on a complaint, the Court accepts the allegations of the complaint as true.

*Id.*  By contrast, when reviewing a factual attack on a complaint, the Court "may not

presume the truthfulness of the complaint's factual allegations."  *Id.* at 1003.  With a factual

attack, the moving party challenges the facts upon which subject-matter jurisdiction

depends. *Id.* The Court therefore must make its own findings of fact. *Id.* In order to make its findings regarding disputed jurisdictional facts, the Court "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing." *Id.* (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990); *Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir. 1987)). The Court's reliance on "evidence outside the pleadings" to make findings concerning purely jurisdictional facts does not convert a motion to dismiss pursuant to Rule12(b)(1) into a motion for summary judgment pursuant to Rule 56. *Id.*

## B.    Rule 12(b)(6)

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed R. Civ. P. 12(b)(6) (stating that a complaint may be dismissed for "failure to state a claim upon which relief can be granted"). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted). To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) ("The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations." (quoting *Twombly*, 550 U.S. at 570)). "A claim has facial

-6-

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (brackets in original; internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 557).

The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a factual allegation has been stated, "but it has not show[n][]that the pleader is entitled to relief," as required by Fed. R. Civ. P. 8(a). *Iqbal*, 552 U.S. at 679 (second brackets added; citation and internal quotation marks omitted).

### III. Analysis

### A. Eleventh Amendment Immunity

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Consistent with the Eleventh Amendment's primary purpose in according states the respect owed to them as joint sovereigns, *see Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 765 (2002), however, this unambiguous language has been extended to prohibit suits brought by citizens against their own states. *See Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001); *Kimel*

*v. Fla. Bd. of Regents*, 528 U.S. 62, 72-73 (2000).  Accordingly, "[t]he ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Garrett*, 531 U.S. at 363.  This Eleventh Amendment immunity "applies regardless of whether a plaintiff seeks declaratory or injunctive relief, or money damages." *Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1252 (10th Cir. 2007) (citing *Fed. Mar. Comm'n*, 553 U.S. at 765-66).

Sovereign immunity under the Eleventh Amendment extends to states and to state entities; it does not extend "to counties, municipalities, or other local government entities." *Steadfast Ins. Co.*, 507 F.3d at 1253 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)).  "If a state entity is more like a political subdivision—such as a county or city—than it is like an instrumentality of the state, that entity is not entitled to Eleventh Amendment immunity."  *Steadfast Ins. Co.*, 507 F.3d at 1253 (citing *Mt. Healthy*, 429 U.S. at 280); *see also Sturdevant v. Paulsen*, 218 F.3d 1160, 1164-65 (10th Cir. 2000). To determine the category into which a particular entity falls, the Court considers whether the entity is an "arm of the state."  *Steadfast Ins. Co.*, 507 F.3d at 1253. In determining whether an entity is an "arm of the state," the Court considers four primary factors:

> First, we assess the character ascribed to the entity under state law. Simply stated, we conduct a formalistic survey of state law to ascertain whether the entity is identified as an agency of the state. *See Sturdevant,* 218 F.3d at 1164, 1166. Second, we consider the autonomy accorded the entity under state law. This determination hinges upon the degree of control the state exercises over the entity. *See id.* at 1162, 1164, 1166. Third, we study the entity's finances. Here, we look to the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf. *See id.* Fourth, we ask whether the entity in question is concerned primarily with local or state affairs. In answering this question, we examine the agency's function, composition, and purpose. *See id.* at

1166, 1168-69.

*Steadfast Ins. Co.*, 507 F.3d at 1253.

Before venturing into this analysis, there are two initial administrative matters that warrant the Court's attention.  First, the Court is cognizant of the fact that it is not writing on a blank slate.  The School has been in existence since 1874, and in the intervening period multiple judicial opinions have suggested that the School is a state actor.  *See, e.g.*, *Wilson v. People*, 708 P.2d 792, 798 n.6 (Colo. 1985) (referring to the School as a "state institutional facility"); *Boulder Valley Sch. Dist. RE-2 v. Colo. State Bd. of Educ.*, 217 P.3d 918, 928 (Colo. App. 2009) (referring to the School as a "state-funded and -controlled public school").  However, these characterizations of the School are dicta and therefore do not mandate that the Court find arm-of-the-state status in the present case.  Second, because of the inextricable connectedness of the School and the Board, for purposes of Eleventh Amendment analysis the Court evaluates the School and the Board (collectively, "CSDB") as one entity.[3]

### 1.   Character of CSDB

First, the Court examines the character of CSDB under Colorado law.  Plaintiffs proffer an exhaustive litany of excerpted statutory language and analysis in support of their argument that CSDB "is not 'identified as an agency of the state' under [Colorado] law."

---

[3] Case law from both the Tenth Circuit and Colorado Supreme Court suggests that such aggregation is appropriate.  *See, e.g.*, *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1232-33 (10th Cir. 1999) (relying on characteristics of the Utah State School for the Deaf and Blind's Board of Trustees in determining that the Utah State School for the Deaf and Blind is an arm of the state); *Graham v. State*, 956 P.2d 556, 562-65 (Colo. 1998) (examining characteristics of the University of Northern Colorado's Board of Trustees in determining that the University of Northern Colorado is an arm of the state).

*Resp.* [#28] at 3.  The Court is not persuaded.[4]

Colorado law designates the School as a "body corporate," C.R.S. § 22-80-102(1)(a), and designates the Board as "trustees for [the School]," C.R.S. § 22-80-103(1)(a).  The Colorado Supreme Court has noted that designation as a "body corporate" does not preclude a finding that a particular entity is an arm of the state.  *See Graham v. State*, 956 P.2d 556, 563 (Colo. 1998).  Indeed, drawing on jurisprudence from other jurisdictions, the Colorado Supreme Court has noted that a state's choice of corporate form for its educational institutions or their governing boards is merely a "convenient means" by which educational institutions are able to pursue educational goals.  *Graham*, 956 P.2d at 563 (collecting cases).  The Court finds this rationale persuasive.  *Cf. Hamilton Mfg. Co. v. Trs. of State Colls. in Colo.*, 356 F.2d 599, 601 (10th Cir. 1966) (finding designation as a "body corporate" to be no indication of intent to waive sovereign immunity).  Accordingly, CSDB's status as a "body corporate" does not preclude a finding that CSDB is an agency of the state.

_____

[4] As an initial matter, Colorado law does not explicitly define CSDB as either an arm of the state or a political subdivision.  Plaintiffs place considerable emphasis on the fact that a Colorado statute declares the School to be a "local educational agency" for purposes of federal law.  *See Resp.* [#28] at 4 (citing C.R.S. § 22-80-102(3)).  However, such emphasis is misguided.  While the statute declares the School to be a "local educational agency" for purposes of *federal law*, such language does not preclude a finding that the School is a state educational agency for purposes of *state law*.  *See generally Field v. Mans*, 516 U.S. 59, 66-67 (1995) (describing the negative pregnant rule of construction).  And the Tenth Circuit has made clear that it is "the character ascribed to the entity under state law," not federal law, that is relevant to the Court's arm-of-the-state analysis.  *Steadfast Ins. Co.*, 507 F.3d at 1253 (citing *Sturdevant,* 218 F.3d at 1164).  Moreover, it is of no moment that Plaintiffs' underlying claims concern issues of federal law — Plaintiffs have presented no authority, and the Court has found none, suggesting that arm-of-the-state analysis should be performed in reference to the relevant underlying claims.  *See generally Steadfast*, 507 F.3d at 1253; *Sturdevant*, 218 F.3d at 1164.  Accordingly, the Court examines a broad cross-section of Colorado statutes in determining whether CSDB is an "instrumentality of the State of Colorado."  *Sturdevant*, 218 F.3d at 1162.

Aside from defining CSDB as a "body corporate," Colorado law provides unequivocally that the Colorado Department of Education ("CDOE") includes CSDB. C.R.S. § 22-2-103(1)(a); C.R.S. § 24-1-115(8).  It is not disputed that CDOE is a state agency, *see* C.R.S. §§ 24-1-101, -110, -115; *accord Williams v. Recovery Sch. Dist.*, 859 F. Supp. 2d 824, 832 (E.D. La. 2012); *Stewart v. Smith*, No. 5:08cv280/RS/EMT, 2010 WL 4783021, at *3 (N.D. Fla. Oct. 25, 2010); *Mulero v. Conn. Dep't of Educ.*, 253 F.R.D. 33, 38 (D. Conn. 2008); *Rivera-Carrero v. Rey-Hernandez*, No. Civ. 04-1925(PG), 2006 WL 572349, at *5 (D.P.R. Mar. 7, 2006), and the Tenth Circuit and Colorado appellate courts have assumed that other entities "included" within CDOE are also state agencies, *see, e.g.*, *Sturdevant*, 218 F.3d at 1169 n.3 (citing *Ambus v. Granite Bd. of Educ.*, 995 F.2d 992, 995 (10th Cir. 1993) (all state educational boards); *Boulder Valley Sch. Dist. RE-2 v. Colo. State Bd. of Educ.*, 217 P.3d 918, 921 (Colo. App. 2009) (state charter school institute). Accordingly, the fact that a Colorado statute unequivocally provides that CSDB is "included" within CDOE supports the conclusion that CSDB is an agency of the state.

A fair amount of statutory language also suggests that CSDB is best characterized as an agency of the state.  Importantly, the School and the Board are entirely absent from provisions of Colorado law that deal with political subdivisions.  *See, e.g.*, C.R.S. §§ 29-1-202(2); 38-5.5-102(1); 1-7.5-103(6).  In addition, Colorado law declares that the School is "one of the educational institutions of the state of Colorado," C.R.S. § 22-80-101(1)(b); that the School "shall be a resource to . . . state institutions . . . ," C.R.S. § 22-80-102(2); and that the Board shall be appointed by the state executive subject to certain geographic diversity requirements, thereby ensuring representation of the interests of the state as a whole, *see* C.R.S. § 22-80-103(1)(b).  Moreover, for purposes of the Public Finance Act of

1994, the School is defined as a "state program," C.R.S. § 22-54-129(1)(f), and for purposes of Education of Exceptional Children, the School is defined as a "state-operated program," C.R.S. § 22-20-103(28)(a).  Perhaps most importantly, however, the Colorado Constitution provides that educational institutions for the deaf and blind "shall be established and supported *by the state*."  Colo. Const. Art. VIII sec. 1 (emphasis added). While these statutory excerpts suggesting state-agency status are not dispositive, either individually or in the aggregate, they strongly suggest that Colorado law characterizes CSDB as an agency of the state.

In a similar vein, it is also apparent to the Court that CSDB acts in essence as a regulatory body for the education of the deaf and blind in the state of Colorado.  The School has for its objective "the education of the children of the state [of Colorado] who, by reason of the impairment of their sense of hearing or of sight, cannot be advantageously educated in the other schools or educational institutions of the state."  C.R.S. § 22-80-102(b).  The Board is statutorily authorized "to grant charters to applicants that propose a charter school that is designed to provide educational services solely to students who would qualify for admission to [the School]" and to "promulgate rules governing the contents of, procedures for, approval of, and appeals pertaining to, a charter application . . . and renewal of a charter."  C.R.S. § 22-80-102(4)(b).  The Board is further statutorily authorized "[t]o act on behalf of the state of Colorado pursuant to a statutory authorization . . . ," C.R.S. § 22-80-103(4)(d), and "[t]o set tuition and other fees for nonresidents of the state and to enter into contracts for the admission of nonresident students into the [S]chool . . . ," C.R.S. § 22-80-103(4)(m).  All of these powers and duties are consistent with the proposition that Colorado law recognizes CSDB as an agency of the state.

Plaintiffs argue to the contrary by juxtaposing CSDB and the State Charter School Institute ("SCSI"). Plaintiff's arguments in this area are deficient. First, the fact that only SCSI is designated as an "independent agency," *see* C.R.S. § 22-30.5-503(1)(a), has no bearing on whether CSDB is an arm of the state—the two entities are unrelated. Second, the fact that the statute explicitly describes SCSI as an agency of the state for only two very limited, localized purposes, *see* C.R.S. § 22-30.5-503(8), while not using any similar descriptor for CSDB, carries little weight in suggesting that CSDB is or is not an arm of the state. Third, the fact that SCSI is "deemed not to be a school district for any purpose," *see* C.R.S. § 22-30.5-503(7), while CSDB is subject to some of the same financial assistance requirements as are school districts, *see* C.R.S. § 22-43.7-113, does not suggest that CSDB is ultimately comparable to a school district[5]—such profound extrapolation is unnecessary. Fourth, Defendant ignores the importance of the subjunctive form of C.R.S. § 24-1-115—the fact that CDOE includes CSDB unconditionally, *see* C.R.S. § 24-1-115(8), but includes SCSI only "as if the institute were transferred by a type 1 transfer to the department of education," see C.R.S. § 24-1-115(9), suggests that CSDB actually shares a *closer* relationship with CDOE than does SCSI.

In addition to these deficiencies, Plaintiffs' attempted juxtaposition ultimately fails for lack of convincing authority that SCSI is itself a state agency. No court in this jurisdiction has held or even assumed that it is. Absent such a holding or assumption, SCSI cannot be used to demarcate the boundaries of state-agency status, and therefore cannot be used to show that CSDB is not a state agency. However, the law does provide the basis for a

---

[5] School districts are generally not considered to be arms of the state. *See Mt. Healthy*, 429 U.S. at 280.

more appropriate comparison: with respect to its oversight of the education of the deaf and blind in the state of Colorado, CSDB enjoys and is subject to remarkably similar powers and duties as is the State Board of Community Colleges and Occupational Education ("SBCCOE")  in its oversight of private occupational schools in the State of Colorado. *Compare* C.R.S. § 23-60-102, -104, -107, -202 *with* C.R.S. § 22-8-102, -103.  That the Tenth Circuit has acknowledged SBCCOE's status as "an instrumentality of the State of Colorado" therefore supports the conclusion that CSDB is an agency of the state.

While Colorado law does not explicitly define CSDB as a state agency, both statutory law and case law suggest clearly that the Colorado General Assembly intended for CSDB to be so characterized.  The character of CSDB under Colorado law therefore weighs in favor of arm-of-the-state status.

### 2.    Autonomy of CSDB

Second, the Court evaluates the extent of the State of Colorado's control over CSDB.  Plaintiffs assert that the powers and duties of Defendants are quite broad and are largely removed from state control.  *Resp.* [#28] at 9-12.  The Court is not persuaded.

CSDB is statutorily authorized, *inter alia*, to: (1) enter into intergovernmental agreements with school districts or other local government entities; (2) create partnerships with boards of cooperative services; (3) charter schools; (4) enter into contracts and receive federal matching funds for moneys spent in providing student health services; (5)  sue and be sued in its own name; (6) incur debts, liabilities, and obligations; (7) cooperate and contract with the state or federal government; and (8) own and engage in transactions involving real and personal property.  C.R.S. § 22-80-102, -103.  The Court agrees with Plaintiffs that these powers, "analogous to those enjoyed by local school districts," seem

to suggest that CSDB exercises substantial political and financial autonomy.  *Cf. Duke v. Grady Mun. Sch.*, 127 F.3d 972, 979 (10th Cir. 1997) (listing autonomous functions of local school districts and concluding that local school districts possess "considerable local autonomy and control").

Nevertheless, the Tenth Circuit has dictated that "these powers must be considered in light of the purpose, composition, and function of the state entity in question." *Sturdevant*, 218 F.3d at 1168.  In this regard, Plaintiffs miss a fundamental point: "[t]he Board is itself the state's instrumentality of control."  *Sturdevant*, 218 F.3d at 1168.  In finding that local school districts were political subdivisions, the Tenth Circuit in *Ambus v. Granite Board of Education* "gave significant weight to the fact that local school boards, which consist of members who are *locally elected*, exercise responsibilities free from state control."  *Sutton*, 173 F.3d at 1232 (emphasis added) (citing *Ambus*, 995 F.2d at 996).  In finding that a state university was an arm of the state, the Tenth Circuit in *Watson v. University of Utah Medical Center*, 75 F.3d 569 (10th Cir. 1996), "placed emphasis on the fact that the University was controlled by a sixteen-member board of regents, fifteen of whom were *appointed by the Governor*."  *Sutton*, 173 F.3d at 1233 (emphasis added) (citing *Watson*, 75 F.3d at 575).  In regard to autonomy, the present case has far more in common with *Watson* than with *Ambus*—all members of the Board are appointed by the Governor of the State of Colorado; none are locally elected.  Furthermore, beyond the role played by the Governor, the Commissioner of CDOE has the duty "[t]o supervise, manage, and control [CSDB] . . . ."  C.R.S. § 22-2-112(1)(m).  Such  control by state executives supports the proposition that CSDB does not possess any meaningful degree of autonomy.

This control by state executives is reinforced by extensive reporting requirements.

Colorado law dictates that, on or before January 1 of each year, the Board must provide to the Education Committees of the Senate and House of Representatives a report containing the following information: "[a]ll [S]chool performance report data for the [S]chool, as specified by the department of education; [a]ll training, mentoring, and professional development activities arranged for the [S]chool's teachers; and [a]ny parental education and parental involvement components in the [S]chool's program."   C.R.S. § 22-80-103(7)(a)-(c).  Viewed in light of the Governor's power to "remove any [Board] member for misconduct, incompetence, or neglect of duty," C.R.S. § 22-80-103(1)(b), these provisions demonstrate that the State of Colorado exercises significant supervision and control over CSDB affairs.

Although at first blush CSDB appears to exercise a large degree of autonomy in regard to the oversight of the education of the deaf and blind in Colorado, it is apparent to the Court that control lies firmly in the hands of the state.  This weighs in favor of arm-of-the-state status.

### 3.    Finances of CSDB

Third, the Court surveys CSDB's finances.  A review of Tenth Circuit case law suggests that evaluation of an entity's finances should address two discrete considerations: first, the extent to which the entity is financially independent from the state; second, the extent to which the state is liable for judgments against the entity.  *See Duke*, 127 F.3d at 980-82.  The Court addresses in turn each of these considerations.

In regard to financial independence, Plaintiff avers that the Board has the power to raise funds independent of state action.  *Resp.* [#28] at 15.  In support of this averment, Plaintiff points to C.R.S. § 22-80-103(5)(a), which indicates that the Board "is authorized

-16-

to receive gifts, grants, and donations from private or public sources," and that such "[g]ifts, grants, and donations received by the [Board] may be transmitted to the state treasurer who shall credit the same to [CSDB]." *See* C.R.S. § 22-80-103(5)(a). The Court agrees that such statutory language suggests that the Board has the power to raise funds. This power is severely limited, however, by the Board's inability to issue bonds or levy taxes. Defendants' power to raise funds generates only six percent of CSDB's budget; in comparison, over eighty percent of CSDB's budget is composed of legislative appropriations. *Motion* [#16] at 6. To the Court, these figures suggest a condition of profound financial dependence. *See generally Steadfast*, 507 F.3d at 1255 (citing *Sturdevant*, 218 F.3d at 1169-70) ("[T]he absence of taxing authority and the ability to issue bonds . . . renders an agency more like an arm of the state than a political subdivision.").

In regard to State liability, the Board claims that a judgment against it would be paid out of the state's risk management fund ("RMF"). *Motion* [#16] at 6. The Colorado General Assembly created the RMF "[t]o pay liability claims and expenses related thereto, brought against the state, its officials, or its employees pursuant to the Colorado Governmental Immunity Act . . . and claims against the state, its officials, or its employees arising under federal law." C.R.S. § 24-30-1510(3)(a). For purposes of the Division of Risk Management, "state agency" is defined to include "*any board*, commission, advisory board, *or other entity established by law within* or as an advisory to *any existing state department*." C.R.S. § 24-30-1502(5)(a) (emphasis added). Because CDOE is an existing state department, C.R.S. § 24-1-110, and CSDB is established by law within CDOE, C.R.S. § 24-1-115(8); 22-80-103(1)(a), CSDB is therefore a "state agency" for purposes of the Division of Risk Management. Accordingly, Colorado law dictates that any judgment

-17-

against CSDB would be paid out of the RMF, C.R.S. § 24-30-1510(3)(a), the effect of which would be to deplete the state treasury.

Prior to the United States Supreme Court's decision in *Regents of the University of California v. Doe*, 519 U.S. 425 (1997), several Circuit Courts of Appeal suggested that depletion of state funds could be sufficient to confer Eleventh Amendment immunity. *See, e.g.*, *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 296 (2d Cir. 1996) ("[W]e must also ask whether a judgment against the Thruway Authority would have the practical effect of requiring payments from New York."); *Hadley v. North Ark. Cmty. Technical Coll.*, 76 F.3d 1437, 1441 (8th Cir. 1996) ("[E]ven if [the entity] could initially satisfy a judgment from other operating revenues, such as tuition payments or federal grants, the judgment would produce a higher operating budget shortfall that must, by state law, be satisfied by an appropriation from the state treasury."). However, it is far from clear that even if the state's RMF must pay a judgment against CSDB, such a judgment is against the state for purposes of Eleventh Amendment immunity. "The key question is whether funds to satisfy a money judgment would come directly from the state, or indirectly through commingled state and local funds or state indemnification provisions." *Sutton,* 173 F.3d at 1233 (citing *Ambus,* 995 F.2d at 996). "In answering this question, we focus on the legal incidence, not the practical effect, of the liability." *Sturdevant*, 218 F.3d at 1165 *(*citing *Duke,* 127 F.3d at 981). "However the risk management fund may operate in practice—even were indemnification a certainty—this would not definitively resolve the question in favor of arm-of-the-state status." *Sturdevant*, 218 F.3d at 1166 (citing *Sutton*, 173 F.3d at 1233; *Duke,* 127 F.3d at 981).

The statutory provisions of the state's RMF compel the Court to conclude that the

-18-

state would be both legally and practically responsible for any judgment against CSDB. C.R.S. § 24-30-1510(1)(a) dictates that the RMF "shall consist of all moneys that may be appropriated thereto by the general assembly or that may be otherwise made available to it by the general assembly." This language suggests that the RMF comprises *only* state funds and *not* commingled state and local funds. Furthermore, mention of indemnification is wholly absent from the parts of the statute that discuss the RMF. *See generally* C.R.S. § 24-30-1501 to -20. Most importantly, however, the statute makes clear that where a judgment is paid from the RMF, the state is the real party in interest and therefore bears the legal incidence of the judgment:

> Expenditures shall be made out of the [RMF] . . . [t]o pay liability claims and expenses related thereto, *brought against the state*, its officials, or its employees pursuant to the "Colorado Governmental Immunity Act", article 10 of this title, and claims against the state, its officials, or its employees arising under federal law, *which the state is legally obligated to pay* . . . .[6]

C.R.S. § 24-30-1510(3)(a) (emphasis added).

While CSDB does possess some degree of financial independence, the Court finds this independence insignificant for purposes of this analysis. Furthermore, because judgments against CSDB are the legal obligation of the state and directly deplete state funds, the Court concludes that CSDB's finances weigh in favor of arm-of-the-state status.

### 4. Function of CSDB

Fourth, the Court considers whether CSDB is concerned primarily with local or state affairs. This factor weighs heavily in favor of arm-of-the-state status. The legislature

---

[6] The Court is cognizant of the fact that "state agency" is not explicitly included in this statutory language. The Colorado Supreme Court has, however, inferred such inclusion. *See Graham* at 565 (citing C.R.S. § 24-30-1510(3)(a)) ("The Colorado General Assembly has created a risk management fund to pay judgments entered against state agencies.").

created CSDB as "an institution for the support and education of deaf and blind children residing within the state of Colorado," C.R.S. § 22-80-102(1)(a), and CSDB acts "as a resource to school districts, state institutions, and other approved education programs." C.R.S. § 22-80-102(2). These functions suggest that CSDB is concerned with state affairs. Moreover, as noted earlier in Section III.A.1., the School and the Board compose what is effectively a regulatory body for the education of the deaf and blind in Colorado. The Court finds nothing to suggest that CSDB is in any way concerned with purely local affairs. Such weighs in favor of arm-of-the-state status.

* * *

The Tenth Circuit has acknowledged that "[b]ecause of the open-ended nature of the arm-of-the-state analysis, it is easy to become caught up in the minutiae of state law . . . ." *Sturdevant*, 218 F.3d at 1170. However, the Tenth Circuit has warned that such minutiae "must not eclipse a fundamental distinction that emerges from *Mt. Healthy* and the cases following it—between alter egos or instrumentalities of states on one hand, and political subdivisions such as cities and counties on the other." *Sturdevant*, 218 F.3d at 1170. Considering all factors in context, the Court finds that CSDB does not possess the "fundamental characteristic of a political subdivision—political control by some community other than the state as a whole." *Sturdevant* 218 F.3d at 1170. The Court therefore concludes that the School and the Board are, in character, purpose, and form, arms of the State of Colorado. *See generally Condos v. Musculoskeletal Transplant Found.*, 208 F. Supp. 2d 1226, 1229 (D. Utah 2002) ("[I]f it looks like a duck, walks like a duck, and sounds like a duck, it must be a duck.").

**B.      42 U.S.C. § 1983**

Plaintiffs bring four claims pursuant to 42 U.S.C. § 1983—against the School, the

Board, Defendant Tutt in his official capacity, and Defendant Tutt in his individual capacity.

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper proceeding for
> redress . . . .

42 U.S.C. § 1983.  For purposes of simplicity and efficacy, the Court separates Plaintiffs'

Section 1983 claims into two groups.  The first group comprises Plaintiffs' Section 1983

claims against state actors.  The second group comprises Plaintiffs' Section 1983 claims

against non-state actors.

### 1.    Section 1983 Claims Against the State

The Court begins with Plaintiffs' Section 1983 claims against the School, the Board,

and Principal Tutt in his official capacity.  In *Will v. Michigan Department of State Police*,

the United States Supreme Court held that "neither a State nor its officials acting in their

official capacities are 'persons' under § 1983." 491 U.S. 58, 71 (1989).  As discussed earlier

in Section III.A, the School and the Board are arms of the state; consequently, for purposes

of Section 1983, Defendant Tutt in his official capacity is a state official.  The School, the

Board, and Defendant Tutt in his official capacity are therefore not "persons" for purposes

of Section 1983.  Because a cause of action under Section 1983 requires a deprivation of

a civil right by a "person" acting under color of state law, Plaintiffs' Section 1983 claims

against the School, the Board, and Defendant Tutt in his official capacity must fail.  *Cf.*

*Sutton*, 173 F.3d at 1237.  The Court therefore **recommends** that the Motions [#16, #17]

be **granted** in regard to Plaintiffs' second claim for relief and in regard to Plaintiffs' first claim for relief as it pertains to Defendant Tutt in his official capacity, and that these claims and portions thereof be **dismissed with prejudice**. *See Norris v. Buena Vista Corr. Complex*, No. 12-cv-00924-DME-KMT, 2013 WL 674030, at *1 (D. Colo. Feb. 25, 2013).

### 2.      Section 1983 Claims Against Non-State Actors

Plaintiffs allege that Defendant Tutt in his individual capacity violated Plaintiff BPS's Fourteenth Amendment right to substantive due process. *See Resp.* [#27] at 7-9. Defendant Tutt asserts that this claim is barred because he is entitled to qualified immunity. *Motion* [#17] at 3. A government official is entitled to qualified immunity from liability for civil damages when his or her allegedly unlawful conduct did not violate any of the plaintiff's constitutional rights that were "clearly established" at the time of the conduct and that would have been known to a reasonable person in the official's position. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a defendant asserts qualified immunity in a Rule 12(b)(6) motion to dismiss, as does Defendant Tutt here, the Court employs a two-step process to determine whether the defendant is entitled to qualified immunity. In the first step, the Court evaluates whether the Plaintiff has alleged a constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. However, "if a violation could be made out on a favorable view of the parties' submissions, . . . [the second] step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201. The United States Supreme Court has made clear that the Court is free to consider the two prongs of the qualified immunity

analysis in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Fourteenth Amendment does not impose upon a state an affirmative obligation to ensure that its citizens are not deprived of life, liberty, or property. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). There are, however, two exceptions to this general rule: the "special relationship" doctrine and the "danger creation" theory. *See generally Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995) (providing an overview of the special relationship doctrine and danger creation theory). Under both exceptions, a state *does* have a constitutional duty to ensure that its citizens are not deprived of life, liberty, or property. *Id.* Plaintiffs argue that both the special relationship doctrine and danger creation theory are applicable to the present case, and that the state therefore had a constitutional duty to ensure that BPS was not deprived of life, liberty, or property.[7] *See Compl.* [#1] at 7-8. Plaintiffs argue that Defendant Tutt's failure to take actions to protect Plaintiff BPS and other students from "a known risk of sexual assault by another student," *id.* at 8, violated this duty and that Defendant Tutt is therefore liable for a Fourteenth Amendment substantive due process violation. *See id.* at 7-9. The Court is not persuaded.

### a.    The Special Relationship Doctrine

The special relationship doctrine applies only to "private act[s] of violence by a third

---

[7] In the Response [#26], Plaintiffs change this allegation to violation of a "right to free public education." [#26] at 5. The Court makes two observations regarding this change. First, such a change does not affect the Court's analysis regarding the applicability of the special relationship doctrine or the danger creation theory. Second, while it may be possible to construe such a change as an attempt by Plaintiff to assert a claim under the Individuals with Disabilities Education Act ("IDEA"), Plaintiffs have stated explicitly that they do not assert such a claim. *See Combined Resp. to Claims of Eleventh Amendment Immunity Under 42 U.S.C. § 1983* [#28] at 5 n.4.

party." *Moore v. Guthrie*, 438 F.3d 1036, 1042 (10th Cir. 2006).  "A special relationship

exists when the state assumes control over an individual" and such control is "sufficient to

trigger an affirmative duty to provide protection to that individual."  *Uhlrig*, 64 F.3d at 572.

More specifically, "[i]f the state restrains an individual's freedom to act to protect himself or

herself through a restraint on that individual's personal liberty, the state may thereby enter

into a special relationship during such restraint to protect that individual from violent acts

inflicted by others."  *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1261 (10th Cir.

1998).  Importantly, the special relationship doctrine applies only when the government

*involuntarily* restrains a person, *United States v. Patton*, 451 F.3d 615, 637 (10th Cir.

2006); the special relationship doctrine does not apply when the relationship between the

involved parties is consensual, *see Liebson v. N.M. Corr. Dep't*, 73 F.3d 274, 276 (10th Cir.

1996) (finding the special relationship doctrine inapplicable to an employer-employee

relationship).

It is clear to the Court that the nature of the relationship between Defendant Tutt and

Plaintiff BPS is consensual.  The School "has for its object the education of the children of

the state who, by reason of the impairment of their sense of hearing or of sight, cannot be

advantageously educated in the other schools or educational institutions of the state."

C.R.S. § 22-80-102(1)(b).  In pursuit of this objective, the School provides its students with

opportunities the students likely would not enjoy if they did not attend the School.  This

increase in opportunity, together with the fact that the School in no way holds students

against the students' will, *see Graham v. Indep. Sch. Dist. No. I-89*, 22 F.3d 991, 994 (10th

Cir. 1994) (finding that "compulsory school attendance laws do not spawn an affirmative

duty to protect under the Fourteenth Amendment"), compels the conclusion that the

relationship between Defendant Tutt and Plaintiff BPS is fundamentally different from the type of involuntary restraint that gives rise to the special relationship doctrine.

Further, the Tenth Circuit Court of Appeals has provided no indication that an exception to this rule may exist if the school the child attends is the child's only viable option, like CSDB may be for Plaintiff BPS.  Whether a student has a choice of schools does not appear to affect whether a special relationship arises between the school and the child.  *See Graham*, 22 F.3d at 994.  Rather, the pertinent issue is whether the custodial relationship is so restrictive as to impose on the State the same duty to protect that the State owes to prison inmates.  *Id.* (citing *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 732 (8th Cir. 1993)).  The Tenth Circuit and other Courts of Appeals have repeatedly held that state-mandated school attendance is not sufficiently restrictive as to equate schoolchildren with prisoners or mental patients.  *Graham*, 22, F.3d at 994; *Dorothy J.*, 7 F.3d at 732; *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364 (3d Cir. 1992); *J.O. v. Alton Community Unit Sch. Dist. 11*, F.2d 267, 272-73 (7th Cir. 1990).  This remains true even if the "quasi-custodial nature of school attendance" is coupled with the foreseeability of a known potential harm.  *Graham*, 22 F.3d at 994; *see DeShaney*, 489 U.S. at 203 (stating that, in such a situation, "[t]he most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them").  Thus, as in *Graham*, 22 F.3d at 995, the Court here is "constrained to conclude because no special relationship existed between [Plaintiff BPS] and [D]efendants, [D]efendants' alleged nonfeasance in the face of specific information which would mandate action does not invoke the protections of the Due Process Clause."  "Inaction by the state in the face of a known danger is not enough to

trigger the obligation; according to *DeShaney* the state must have limited in some way the liberty of a citizen to act on his own behalf." *Id.* (quoting *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993)).

Accordingly, the Court concludes that the special relationship doctrine is inapplicable to the present case.

### b.    The Danger Creation Theory

The danger creation theory "applies only when a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence." *Robbins v. Oklahoma*, 519 F.3d 1242, 1251 (10th Cir. 2008) (internal quotation marks omitted) (citing *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001)).  To state a prima facie case under the danger creation theory, the plaintiff must show that:

> (1) state actors created the danger or increased the plaintiff's vulnerability to the danger in some way, (2) the plaintiff was a member of a limited and specifically definable group, (3) the defendants' conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm, (4) the risk was obvious or known, (5) the defendants acted recklessly in conscious disregard of that risk, and (6) the conduct, when viewed in total, shocks the conscience.

*Robbins*, 519 F.3d at 1251 (citing *Ruiz v. McDonnell*, 299 F.3d 1173, 1182-83 (10th Cir. 2002)).  The Court finds that Defendant Tutt's conduct does not satisfy the danger creation theory's prima facie standard because Plaintiffs have not pled facts adequate to meet the first and sixth elements of the standard.

In regard to the first element, a plaintiff must "demonstrate affirmative conduct on the part of the State Defendants that created or increased the danger . . . .  Affirmative conduct for purposes of § 1983 should typically involve conduct that imposes an immediate threat of harm, which by its nature has a limited range and duration." *Ruiz,* 299 F.3d at

1183; *accord L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) (noting that invocation of the danger creation theory "necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger").  Plaintiffs do not allege that Principal Tutt engaged in any affirmative conduct whatsoever; rather, Plaintiffs allege only nonfeasance.  *See generally Compl.* [#1] at 7-9.  Nonfeasance is insufficient to satisfy the first element of the danger creation theory's prima facie standard.  *See Sutton*, 173 F.3d at 1238 n.13 (citing *Graham*, 22 F.3d at 995).

In regard to the sixth element, conduct that shocks the conscience involves "deliberately wrongful government decisions rather than merely negligent government conduct." *Uhlrig*, 64 F.3d at 573.  "[I]ll-advised, inappropriate, or ill-considered" actions do not "shock the conscience of federal judges." *Livsey v. Salt Lake Cnty.*, 275 F.3d 952, 958 (10th Cir. 2001) (quoting *Uhlrig*, 64 F.3d at 567).  "[D]eliberate decisions of government officials to deprive a person of life, liberty, or property," such as stomach pumping, paddling a student, and intentionally destroying an inmate's property, have been found to shock the conscience.  *See Moore*, 438 F.3d at 1040 (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

In the present case, Plaintiffs do not accuse Defendant Tutt of taking any deliberate, affirmative actions to harm Plaintiff BPS or any other student.  Rather, Plaintiffs state only that Defendant Tutt *failed to take actions* to protect Plaintiff BPS and other students from "a known risk of sexual assault by another student." *Compl.* [#1] at 8.  While such nonfeasance may well sound in negligence, the Court finds that it does not constitute the "deliberate decision[] of [a] government official[] to deprive a person of life, liberty, or property." *Daniels*, 474 U.S. at 331.  Indeed, to hold otherwise "would trivialize the

centuries-old principle of due process of law." *Daniels*, 474 U.S. at 332; *see generally Bank of Columbia v. Okely*, 4 Wheat. (17 U.S.) 235, 244 (1819) (stating that due process is "intended to secure the individual from the arbitrary exercise of the powers of government"). Accordingly, the Court finds the danger creation theory to be inapplicable to the present case.

Because Defendant Tutt's conduct does not invoke either the special relationship doctrine or the danger creation theory, the Court cannot conclude that the state had a constitutional duty to ensure that BPS was not deprived of life, liberty, or property. Absent such a constitutional duty, Plaintiffs cannot demonstrate that Defendant Tutt violated Plaintiff BPS's Fourteenth Amendment right to substantive due process by failing to take actions to protect Plaintiff BPS and other students from "a known risk of sexual assault by another student." *Compl.* [#1] at 8. Defendant Tutt is therefore entitled to qualified immunity,[8] and Plaintiffs' Section 1983 claim against Defendant Tutt in his individual capacity must fail. The Court **recommends** that the Motion [#17] be **granted** in regard to Plaintiffs' first claim for relief as it pertains to Defendant Tutt in his individual capacity, and that this portion of the claim be **dismissed without prejudice**. *See Dicino v. Renfro*, No. 12-cv-01274-WYD-KLM, 2013 WL 2317242, at *13-14 (D. Colo. May 28, 2013).

## C.    ADA and RA Claims

Defendants argue that Plaintiffs' claim for violation of the ADA must be dismissed

---

[8] Because the Court concludes that Plaintiffs have failed to allege facts supporting a claim for violation of BPS's Fourteenth Amendment right to substantive due process, the Court need not proceed with an analysis of whether Plaintiff's rights were clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that although determination of qualified immunity involves a two-step process, if the plaintiff fails either step, no further analysis is required and qualified immunity is appropriate).

as barred by Eleventh Amendment immunity.  Motion [#16] at 13-17.  Defendants further argue that Plaintiffs' claims for violation of both the ADA and RA must be dismissed for failure to state a claim.  *Motion* [#16] at 11-13.  The Court finds that Defendants are not entitled to Eleventh Amendment immunity with respect to Plaintiffs' ADA claim; however, the Court also finds that both Plaintiffs' ADA claim and RA claim must be dismissed for failure to state a claim.

### 1.      Applicability of Eleventh Amendment Immunity

Defendants argue that the Eleventh Amendment bars Plaintiffs' claims for violation of Title II of the ADA.  *Motion* [#16] at 13-17.  In response, Plaintiffs contend that Congress abrogated states' Eleventh Amendment immunity for purposes of Title II of the ADA.  *Resp.* [#26] at 4-6.  In order to determine whether Congress did, in fact, abrogate states' Eleventh Amendment immunity for purposes of Title II of the ADA, the Court looks at two discrete inquiries: "first, whether Congress has unequivocally expresse[d] its intent to abrogate the immunity . . . ," *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996) (internal quotation marks omitted) (brackets in original) (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)), and "second, whether Congress has acted pursuant to a valid exercise of power," *Seminole Tribe of Fla.*, 517 U.S. at 55 (internal quotation marks omitted) (quoting *Green*, 474 U.S. at 68).

As the Tenth Circuit has noted, "there is no question Congress intended Title II [of the ADA] to abrogate sovereign immunity."  *Guttman v. Khalsa*, 669 F.3d 1101, 1117 (10th Cir. 2012) (citing 42 U.S.C. § 12202).  The remaining question is therefore "whether Congress's intent to abrogate sovereign immunity [wa]s a valid exercise of its enforcement power under [Section 5 of the Fourteenth Amendment]."  *Guttman*, 669 F.3d at 1117.  In

answering this question, the Court must consider:

> (1) [T]he nature of the constitutional right at issue; (2) the extent to which Congress's remedial statute was passed in response to a documented history of relevant constitutional violations; and (3) whether the congressional statute is 'congruent and proportional' to the specific class of violations at issue, given the nature of the relevant constitutional right and the identified history of violations.

*Guttman*, 669 F.3d at 1117 (citing *City of Boerne v. Flores*, 521 U.S. 507, 529-36 (1997)).

The Court emphasizes that this question presents an as-applied challenge. As the United States Supreme Court has directed, abrogation of Eleventh Amendment immunity should be decided on a case-by-case basis with respect to the particular governmental services at issue.[9] *Guttman*, 669 F.3d at 1117 (citing *Tennessee v. Lane*, 541 U.S. 509, 527 (2004); *Garret*, 531 U.S. at 365). Accordingly, the Court "approach[es] each of the three prongs of the abrogation inquiry with respect to the specific right and class of violations at issue."[10] *Guttman*, 669 F.3d at 1117.

### a.    The Nature of the Constitutional Right

The first step of the Court's analysis is to identify the constitutional right that Congress sought to protect in enacting Title II and applying it to public educational

---

[9] In *Guttman*, the Tenth Circuit evaluated Congress's intent to abrogate sovereign immunity under the ADA as it pertains to professional licensing. 669 F.3d at 1125. Accordingly, Guttman's analysis of the second prong of the abrogation inquiry is inapposite to the present case. The present issue—whether Congress's intent to abrogate sovereign immunity under the ADA as it pertains to public educational institutions was a valid exercise of its enforcement authority under Section 5 of the Fourteenth Amendment—is one of first impression for this Court.

[10] Some federal courts of appeals have chosen to read *Lane* as conclusively establishing that all Title II claims survive the first two prongs of the inquiry. *See, e.g.*, *Klingler v. Director, Dep't of Revenue, State of Mo.,* 455 F.3d 888, 896 (8th Cir. 2006); *Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 487 (4th Cir. 2005); *Ass'n for Disabled Ams., Inc. v. Florida Int'l Univ.,* 405 F.3d 954, 958 (11th Cir. 2005); *McCarthy ex rel. Travis. v. Hawkins,* 381 F.3d 407, 423 (5th Cir. 2004). The Tenth Circuit does not follow this approach. *Guttman*, 669 F.3d at 1117.

institutions.  *Lane*, 541 U.S. at 522.  The Supreme Court in *Lane* recognized that Title II seeks to enforce the Fourteenth Amendment's "prohibition on irrational disability discrimination."  541 U.S. at 522.  However, while the Court's decisions under the Equal Protection Clause and Due Process Clause suggest that states cannot categorically deny disabled students access to public education, *see Plyler v. Doe*, 457 U.S. 202, 221-22 (1982); *Bd. of Educ. v. Rowley,* 458 U.S. 176, 200 (1982), the Fourteenth Amendment does not forbid *all* discrimination based on disability. Because classifications based on disability are subject to minimal scrutiny, *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 446 (1985), States may make distinctions on the basis of disability provided "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose," *Heller v. Doe,* 509 U.S. 312, 320 (1993). This rule applies even in the context of public education. *See Plyler,* 457 U.S. 202 at 221-23 (recognizing that education is not a fundamental right, such that "a State need not justify by compelling necessity every variation in the manner in which education is provided to its population"); *see also San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 29-40 (1973).

However, the Supreme Court has also recognized the critical role that public education plays in preparing students for work and citizenship, and also the unique harm that occurs when some students are denied the benefits of public education. *See, e.g.*, *Brown v. Bd. of Educ.,* 347 U.S. 483, 493 (1954) ("[I]t is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education"); *Grutter v. Bollinger,* 539 U.S. 306, 331 (2003) ("[T]he diffusion of knowledge and opportunity through public institutions of higher education must be accessible to all individuals").  Consequently, the Supreme Court's Equal Protection Clause and Due

Process Clause jurisprudence places a special emphasis on the constitutional rights implicated by discrimination in public education. Title II seeks to enforce those rights by prohibiting discrimination against the disabled and providing accommodations for their special needs.

### b.    Historical Record of Constitutional Violations

The Court next considers the extent to which Title II was "responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne,* 521 U.S. at 532.  Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Congress deemed this provision necessary to address pervasive discrimination "in such critical areas as . . . housing, public accommodations, *education,* transportation, communication, recreation, institutionalization, health services, voting, and access to public services." 42 U.S.C. § 12101(a)(3) (emphasis added).

Congress first addressed public education of the disabled in 1966 by amending the Elementary and Secondary Education Act of 1965 to provide grants for states to initiate and improve programs for the education of disabled children.  Pub. L.  No. 89-750 § 161, 80 Stat. 1204 (1966).  However, despite monetary incentives and a growing consensus among federal jurisdictions that states were violating the Due Process and Equal Protection rights of disabled children by completely denying them educational opportunities, *see, e.g.*, *Pa. Ass'n for Retarded Children v. Commonwealth,* 343 F. Supp. 279, 293, 297 (E.D. Pa. 1972); *Mills v. Bd. of Ed. of D.C.,* 348 F. Supp. 866, 876 (D.D.C. 1972); *Harrison v. Michigan,* 350 F. Supp. 846, 847 (E.D. Mich. 1972); *Fialkowski v. Shapp,* 405 F. Supp. 946,

958 (E.D. Pa. 1975), a number of states continued to entirely exclude from public education all children with disabilities, *see, e.g.*, Ala.Code § 21-1-10 (1975); Del. Const. art. X, § 1 (1975); Neb.Rev.Stat. § 79-202 (1971); N.C. Gen.Stat. § 115-165 (1966); Nev.Rev.Stat. § 392.050 (1967).   Around this time, congressional studies revealed that of the roughly eight million disabled children in the United States, one million were "excluded entirely from the public school system," *see Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley,* 458 U.S. 176, 189 (1982) (citing 89 Stat. 774, note following § 1401), and the disabled children who were not excluded from public education were "simply 'warehoused' in special classes or were neglectfully shepherded through the system until they were old enough to drop out." *Honig v. Doe,* 484 U.S. 305, 309-11 (1988) (citing H.R. Rep. No. 94-332, at 2 (1975)).

In 1973, Congress responded by enacting the Rehabilitation Act, 29 U.S.C. §§ 701-97, which forbids any program receiving federal aid from discriminating against an individual by reason of a handicap.  29 U.S.C. § 794(a).  In 1975, Congress went further by enacting the Education for All Handicapped Children Act, Pub. L. No. 94-142, 89 Stat. 775 (1975) (later renamed the Individuals with Disabilities Education Act), which requires states receiving federal funds for education to provide all handicapped children the right to a "free appropriate public education."   20 U.S.C. § 1412(a)(1). The Supreme Court characterized this latter legislation as intending to "aid the States in complying with their constitutional obligations to provide public education for handicapped children." *Smith v. Robinson,* 468 U.S. 992, 1009 (1984).

Even after this early federal legislation, however, states continued to violate the constitutional rights of disabled students by denying them access to educational

opportunities. *See, e.g.*, *Hairston v. Drosick,* 423 F. Supp. 180, 184 (S.D. W. Va. 1976); *Cuyahoga Cnty. Ass'n for Retarded Children & Adults v. Essex,* 411 F. Supp. 46, 58-59 (N.D. Ohio 1976); *Panitch v. Wisconsin,* 444 F. Supp. 320, 322 (E.D. Wis. 1977); *N.Y. State Ass'n for Retarded Children, Inc. v. Carey,* 466 F. Supp. 487, 504 (E.D.N.Y. 1979). In the mid-1980s, congressional reports indicated that tens of thousands of disabled children continued to be excluded from public schools or placed in inappropriate programs. U.S. Civil Rights Commission, Accommodating the Spectrum of Individual Abilities 28-29 (1983).  Testimony before the House Committee on Education and Labor and the Senate Subcommittee on Disability Policy included statements by numerous disabled individuals who had been excluded from participation or faced irrational prejudice at all levels of public education. *See generally,* 2 Staff of the House Comm. on Educ. & Labor, 101st Cong., 2d Sess., Legislative History of Pub. L. No. 101-336: The Americans with Disabilities Act 1230 (Comm. Print 1990).

As this evidence demonstrates, for several decades prior to the enactment of the ADA there existed a widespread pattern of unconstitutional exclusion and discrimination perpetrated against disabled children in the realm of public education. Faced with this record of persistent unconstitutional state action, coupled with the inability of earlier federal legislation to solve this "difficult and intractable problem," *Nevada Dep't of Human Res. v. Hibbs,* 538 U.S. 721, 737 (2003) (quoting *Kimel*, 528 U.S. at 88), the Court finds that Title II was enacted in response to a documented history of unlawful disability discrimination.

### c.    Congruence and Proportionality

The Court last considers whether the provisions of Title II, as applied to public educational institutions, are a congruent and proportional response to this history and

pattern of unconstitutional discrimination. *Lane,* 541 U.S. at 530.  Specifically, this inquiry requires the Court to determine whether the application of Title II to public educational institutions is "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne,* 521 U.S. at 532.

Title II forbids public entities from excluding disabled persons from programs, services, or benefits "by reason of such disability."  42 U.S.C. § 12132.  In the context of public education, Title II therefore requires that disabled students not be excluded from educational programs or activities, or otherwise discriminated against, because of their disabilities. Title II also imposes an affirmative obligation to make "reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services" to enable disabled persons to receive services or participate in programs or activities.  42 U.S.C. § 12131(2). In the context of public education, Title II therefore requires public educational institutions to make reasonable accommodations for disabled students to ensure that they are able to participate in educational programs and activities. These provisions directly challenge the historical discrimination identified in Section III.C.1.b.—the discrimination that Congress intended to stamp out by enacting the ADA.

The Court is cognizant of the fact that Title II imposes a greater burden on the states than does the Fourteenth Amendment.  *See Garrett,* 531 U.S. at 367 (noting that, under *Cleburne,* states are "not required by the Fourteenth Amendment to make special accommodations for the disabled").  However, Title II also limits the scope of liability in important respects and thus minimizes compliance costs. *See City of Boerne,* 521 U.S. at

534 (stating that congruence-and-proportionality concerns are most acute where compliance with the federal statute entails "substantial costs" that "far exceed any pattern or practice of unconstitutional conduct"); *see also Hibbs,* 538 U.S. at 738-39. These limitations "tend to ensure Congress' means are proportionate to ends legitimate under § 5." *City of Boerne*, 521 U.S. at 533.

First, and perhaps most significantly, although Title II forbids discrimination based on a person's disability, states remain free to limit participation in their programs or activities for other, lawful reasons.  Second, Title II protects only a "qualified individual with a disability."  42 U.S.C. § 12132.  A plaintiff is required to make this threshold showing before he or she can invoke the nondiscrimination provisions of the ADA. Third, the requirement that public entities make "reasonable modification[s]" to accommodate disabled citizens is limited in important respects.  As the Supreme Court noted in *Lane,* "Title II does not require States to employ any and all means to make . . . services accessible to persons with disabilities, and it does not require States to compromise their essential eligibility criteria for public programs." 541 U.S. at 531-32.  To the extent that Title II requires States to make "reasonable" modifications to their educational programs in order to ensure that disabled citizens have access to those programs, the Court finds such a requirement congruent with the limited constitutional permissibility of rational discrimination. *See Garrett,* 531 U.S. at 367.

Moreover, Title II's implementing regulations provide several avenues by which states can avoid liability.  Most importantly, states retain the right not to "take any action that [they] can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens."  28 C.F.R.

§ 35.150(a). This regulation acknowledges the importance of state autonomy in providing public programs and is consistent with the interest of states in controlling public expenditures. The Supreme Court has noted that this "fundamental alteration" provision allows a State to "show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with [ ] disabilities." *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 604 (1999) (interpreting 28 C.F.R. § 35.130(b)(7)).

By requiring states to make special accommodations for the disabled, Title II does impose a greater burden on states than does the Fourteenth Amendment. *Garrett,* 531 U.S. at 367. But Title II in turn protects against a plague of discrimination and exclusion that has for decades limited the educational opportunities of disabled children. The Court has made it clear that prophylactic legislation such as Title II need not follow perfectly the pattern of discrimination that Congress sought to rectify—such legislation "can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." *City of Boerne,* 521 U.S. at 518. The appropriate question is therefore not *whether* Title II surpasses the limits of the Fourteenth Amendment, but *by how much.* Discrimination against disabled students in public educational institutions affects the present and future rights of those students to enjoy the most basic privileges and responsibilities of citizenship, such as voting and public service. In light of such a persistent pattern of discrimination, the Court cannot say that Title II is "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 532.

The Court's analysis suggests a persistent pattern of exclusion and irrational treatment of disabled students in public education and a congruent and proportional prophylactic response to this pattern of exclusion and irrational treatment.  Accordingly, the Court concludes that, as it applies to discrimination against students at public educational institutions, Title II of the ADA is valid Section 5 legislation. Because Congress clearly expressed its intention to abrogate the States' Eleventh Amendment immunity, and did so pursuant to a valid exercise of constitutional authority, the Eleventh Amendment poses no bar to Plaintiffs' ADA or RA claims.

### 2.  Failure to State a Claim Under the ADA and RA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  To state a claim under Title II, a "plaintiff must allege that (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007) (citing 42 U.S.C. § 12132; *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006)).

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  To state a claim under Section 504, "a

plaintiff must prove (1) that he is a 'handicapped individual' under the [ADA], (2) that he is

'otherwise qualified for the [benefit] sought, (3) that he was [discriminated against] solely

by reason of his handicap, and (4) that the program or activity in question receives federal

financial assistance." *Cohon ex rel. Bass v. N.M. Dep't of Health*, 646 F.3d 717, 725 (10th

Cir. 2011) (quoting *Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1492 (10th Cir.

1992)).

        As numerous Circuits have observed, "[t]he Rehabilitation Act is materially identical

to and the model for the ADA," *Crawford v. Ind. Dep't of Corr.*, 115 F.3d 481, 483 (7th

Cir.1997) (citing *Bryant v. Madigan,* 84 F.3d 246, 248 (7th Cir.1996)); *see also McDonald

v. Penn. Dep't of Pub. Welfare,* 62 F.3d 92, 94 (3d Cir.1995); *Duffy v. Riveland,* 98 F.3d

447, 455 (9th Cir.1996)), "except that it is limited to programs that receive federal financial

assistance." *Crawford*, 115 F.3d at 483.  Accordingly, the Court evaluates Plaintiffs' ADA

claim and Rehabilitation Act claim together.  *See Jarvis v. Potter*, 500 F.3d 1113, 1121

(10th Cir. 2007) (citing 29 U.S.C. § 794(d)).

        For purposes of the ADA and Rehabilitation Act, the term "disability" includes "a

physical or mental impairment that substantially limits one or more of the major life

activities" of an individual.  42 U.S.C. 12102(1)(A); 29 U.S.C. § 794(a).  Individuals

attempting to prove disability status under this standard may not merely rely on evidence

of a medical diagnosis of an impairment; "[i]nstead, the ADA requires those claiming the

Act's protection . . . to prove a disability by offering evidence that the extent of the limitation

caused by their impairment in terms of their own experience is substantial." *Toyota Motor

Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 185 (2002) (citing *Albertson's, Inc. v. Kirkingburg*,

527 U.S. 555, 567 (1999)).  Defendants do not contest that BPS is visually impaired.  It is

also uncontested that seeing is a major life activity. *See Williams*, 534 U.S. at 197 (noting that the term "major life activities," as used in the ADA, "includes such basic abilities as walking, seeing, and hearing"); *see also* 28 C.F.R. § 35.104(2) ("The phrase major life activities means functions such as . . . seeing . . . ."). Accordingly, whether BPS is disabled for purposes of the ADA depends only upon whether his visual impairment "substantially limits" his ability to see.

The Court finds that Plaintiffs have adequately alleged that Plaintiff BPS's visual impairment substantially limits his ability to see. Plaintiff BPS was a student at the School, which "has for its object the education of the children of the state who, by reason of the impairment of their sense of hearing or sight, *cannot* be advantageously educated in the other schools or educational institutions of the state." C.R.S. § 22-80-102(1)(b) (emphasis added). This fact indicates that Plaintiff BPS, because of his visual impairment, could not be advantageously educated at other schools within the state. That Plaintiff BPS, because of his visual impairment, could not be advantageously educated at other schools within the state is an allegation sufficient to suggest that Plaintiff BPS's visual impairment substantially limits his ability to see. Accordingly, the Court concludes that Plaintiffs have adequately alleged that Plaintiff BPS was an individual with a disability and was, by virtue of his enrollment at the School, qualified to receive the benefits and services of the School.

The Court is less inclined, however, to find that Plaintiffs have adequately alleged that Plaintiff BPS "was excluded from participation in or denied the benefits of a public entity's services, programs, or activities" or that "such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson*, 500 F.3d at 1193. Plaintiffs allege that Defendants' conduct "created and resulted in a hostile educational environment for

BPS, . . . had substantial negative effects on the ability of BPS to receive an education, and created an abusive educational environment." *Compl.* [#1] at 14.  Plaintiffs assert that, as a result of Defendants' conduct, Plaintiff BPS was "excluded from participation and/or denied benefits of the services, programs or activities of a public entity . . . ," and that Plaintiff "BPS was denied benefits by reason of his disabilities . . . ." *Compl.* [#1] at 14. These allegations are precisely the "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," that the Supreme Court has held to be inadequate in stating a claim for relief.[11]  *Ashcroft*, 556 U.S. at 678-79.  Accordingly, the Court cannot find that Plaintiffs have adequately alleged that Plaintiff BPS "was excluded from participation in or denied the benefits of a public entity's services, programs, or activities" or that "such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson*, 500 F.3d at 1193.

Because Plaintiffs' claims for creation of a sexually hostile learning environment in violation of the ADA and RA do not allege facts sufficient to state a claim for relief, the Court **recommends** that the Motions [#16, #17] be **granted** in regard to Plaintiff's fourth claim for relief, and that the claim be **dismissed without prejudice**.  *See Reynoldson v. Shillinger*, 907 F.2d 124, 127 (10th Cir. 1990).

## D.    Sexual Harassment in Violation of Title IX

---

[11]  In the Response [#26], Plaintiffs attempt to rebut this charge by reading together the two following excerpts from their Complaint [#1]: (1) "BPS was not able to identify the assailant, because BPS is visually impaired and CS refused to speak"; and (2) "Mr. Stewart . . . was told by Principal Tutt that nothing could be done because the suspect had not been identified." *Resp.* [#26] at 3 (citing *Compl.* [#1] at 3-4).  Plaintiffs encourage the Court to read this language as suggesting that Principal Tutt did not make an incident report (denial of benefit) because the student was visually impaired (disability).  The Court finds that such an interpretation is still a conclusory allegation that cannot withstand pleading standards under *Iqbal* and *Twombly*.

Plaintiffs' third claim for relief is for sexual harassment in violation of Title IX, 20 U.S.C. §§ 1681-88.  Title IX provides that "[n]o person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal assistance." 20 U.S.C. § 1681(a).  Additionally, 42 U.S.C. § 2000d-7 provides that "[a] state shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of . . . title IX of the Educational Amendments of 1972 . . . ."  The United States Supreme Court has held that this language constitutes a valid abrogation of states' Eleventh Amendment immunity under Title IX. *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 72 (1992).  Accordingly, a school receiving federal assistance may properly be sued by one of its students. Because the School and the Board are unable to assert Eleventh Amendment immunity in regard to Plaintiffs' Title IX claim, and because Defendants do not in their filings address Plaintiffs' Title IX claim, the Court makes no recommendation regarding Plaintiff's Title IX claim.

## IV.  Conclusion

For the foregoing reasons, the Court respectfully **RECOMMENDS** that the Motions [#16, #17] be **GRANTED** and that Plaintiffs' first, second, and fourth claims be dismissed as outlined above.

IT IS HEREBY **ORDERED** that, pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  A party's failure to serve and file specific, written objections waives de novo

review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).   A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.   *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated: August 21, 2013                    BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge

-43-