IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-02664-RM-KLM

BPS, a Minor and Disabled Person
KATRINA L. STEWART, his Parent and Next Friend, and
JOHN P. STEWART, his Parent and Next Friend,

      Plaintiffs,

v.

BOARD OF TRUSTEES FOR COLORADO SCHOOL FOR THE DEAF AND BLIND,
COLORADO SCHOOL FOR THE DEAF AND BLIND,
LOUIS TUTT, Individually and in his Official Capacity as Principal for the Colorado School
for the Deaf and Blind, and
DOES 1-10, who are unknown persons,

      Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

      This matter is before the Court on Plaintiffs' **Motion for Leave to File Second Amended Complaint** [#116][1] (the "Motion").  Defendants filed Responses [#143, #144] in opposition to the Motion, and Plaintiffs filed Replies [#155, #156].  The Motion is thus fully briefed and ripe for resolution.  For the reasons set forth below, the Court **RECOMMENDS** that the Motion [#116] be **GRANTED in part and DENIED in part**, as follows.[2]

_____

      [1]  "[#116]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF).  This convention is used throughout this order.

      [2]  A magistrate judge may issue orders on nondispositive motions only.  *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1461, 1462-63 (10th Cir. 1988).  Whether motions to amend are dispositive is an unsettled issue.  *Chavez v. Hatterman*, No. 06-cv-02525-WYD-MEH, 2009 WL 82496, at *1 (D. Colo. Jan 13, 2009) (citing cases).  When an order denying a motion to amend

## I.  Procedural Background

The Court first briefly summarizes the allegations underlying this lawsuit as stated more fully in the pending Recommendation of United States Magistrate Judge, [#69] at 2-4. The events giving rise to the present action took place between 2009 and 2012 at the Colorado School for the Deaf and the Blind (the "School").   Plaintiff BPS is visually impaired, has severe learning disabilities, and at all times relevant to the present action was a minor and a student at the School.  Plaintiffs Katrina L. Stewart and John P. Stewart are Plaintiff BPS's parents and next friends.  Defendant Board of Trustees for the School (the "Board") is a governmental entity within the Colorado Department of Education.  Defendant Louis Tutt ("Tutt") was at all times relevant to the present action employed by the Board as the principal of the School.

Plaintiffs allege that in February 2010, another student, CS, sexually assaulted Plaintiff BPS while on School premises.  On or around May 5, 2011, CS met with a School employee and confessed that, at various times between 2009 and 2011, he had sexually assaulted five students while on School grounds.  One of the students who CS confessed to sexually assaulting was Plaintiff BPS.  Barbara Meese, the current principal of the School, reported CS's confession to the Colorado Department of Human Services ("CDHS").  CDHS then contacted the Colorado Springs Police Department ("CSPD"). CSPD's investigation indicated that Defendant Tutt did not prepare any incident reports or other documentation concerning CS's alleged sexual assault of Plaintiff BPS or any other

---

removes a defense or claim from the case, it may be dispositive.  *Cuenca v. Univ. of Kan.*, 205 F. Supp. 2d 1226, 1228 (D. Kan. 2002).  For the purpose of resolving the present Motion, the Court will assume that the issues involved are dispositive and require a recommendation.

student at the School.  Despite knowledge of multiple incidents of sexual assault at the School and despite knowledge that students at the School faced a continuing threat of sexual assault, Defendants failed to report any conduct or risk to Plaintiff BPS's parents or to law-enforcement authorities.  Additionally, Defendants failed to adopt or implement policies and procedures to lessen the risk or to protect Plaintiff BPS and other students at the School from the risk.

Plaintiffs stated four claims for relief in the initial Complaint.  First, Plaintiffs alleged that Defendant Tutt, in his individual and official capacities, violated 42 U.S.C. § 1983 by failing to adopt policies aimed at preventing sexual assault of Plaintiff BPS.  Second, Plaintiffs alleged that Defendant School and Defendant Board violated 42 U.S.C. § 1983 by failing to adopt policies aimed at preventing sexual assault of Plaintiff BPS.  Third, Plaintiffs alleged that Defendant School and Defendant Board violated Title IX, 20 U.S.C. §§ 1681-88, by exhibiting deliberate indifference to sexual harassment of Plaintiff BPS, thereby creating a hostile educational environment for Plaintiff BPS.  Fourth, Plaintiffs alleged that Defendants violated Title II of the Americans with Disabilities Act (the "ADA"), and also the Rehabilitation Act (the "RA"), by fostering a hostile educational environment that excluded Plaintiff BPS from participation in and the benefits of a public program.

Defendants responded to Plaintiffs' Complaint [#1] with Motions to Dismiss [#16, #17].  The Court subsequently issued a Recommendation [#69] on Plaintiff's claims as follows: (1) Plaintiffs' § 1983 claims against the School, the Board, and Defendant Tutt in his official capacity should be dismissed as they are not "persons" subject to suit under § 1983; (2) Plaintiffs' § 1983 claim against Defendant Tutt in his individual capacity should be dismissed on the basis of qualified immunity because Plaintiffs failed to adequately

allege a Fourteenth Amendment claim; and (3) Plaintiffs' ADA and RA claims should be dismissed because Plaintiffs failed to adequately allege that Defendants created a sexually hostile learning environment.  Defendants did not seek dismissal of Plaintiffs' claim for sexual harassment in violation of Title IX, and thus that claim remains pending.

Plaintiffs filed an Objection [#72] to the Recommendation [#69] in which they requested de novo review of only (2) and (3) above.  They also indicated that they would seek leave to amend the Complaint to address the pleading deficiencies raised by the Court in the Recommendation.  Plaintiffs thereafter filed their first Motion for Leave to Amend Complaint [#83], which the Court denied as moot when Plaintiffs filed the present Motion [#116].  *Minute Order* [#121].  Pursuant to the Motion, Plaintiffs seek to amend the Complaint to add information they assert was primarily gathered in discovery after the pleading amendment deadline in order to salvage their § 1983 claim against Defendant Tutt in his individual capacity and their ADA and RA claims.[3]  Plaintiffs do not seek to add any new claims or defendants.  The Motions to Dismiss [#16, #17] and the related Recommendation [#69] and Objection [#72] remain pending before the District Judge.

## II.  Analysis

As a preliminary matter, the pleading amendment deadline expired on September 23, 2013.  On October 25, 2013, Plaintiffs requested an extension of that deadline to December 6, 2013.  *Motion to Continue Trial Date and Modify Scheduling Order* [#97].  The Court denied that portion of the Motion to Continue without prejudice, stating that it would

---

[3]  Plaintiffs also voluntarily omit their § 1983 claims against the School, the Board, and Defendant Tutt in his official capacity from their proposed Second Amended Complaint. Defendants do not appear to contest this amendment.

"address whether Plaintiffs have provided good cause to extend the deadline for joinder and amendment of pleadings when it adjudicates Plaintiffs' Motion for Leave to File Amended Complaint [#116]." *Order and Recommendation of United States Magistrate Judge* [#122] at 2.   The present Motion [#116] was filed on November 22, 2013, and, therefore, is untimely.  Accordingly, Plaintiffs must provide good cause for their failure to timely move for amendment pursuant to Fed. R. Civ. P. 16(b)(4).  If good cause is shown, the Court next considers any arguments raised by the parties related to whether justice would be served by amendment.  Specifically, the Court should grant leave to amend "freely . . . when justice so requires." Fed. R. Civ. P. 15(a)(2).  Leave to amend need not be given, however, when the moving party unduly delayed, failed to amend despite ample opportunity to do so, the nonmoving party would be unduly prejudiced, or amendment would be futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

**A.     Good Cause to Modify the Pleading Amendment Deadline Under Rule 16(b)**

Plaintiffs contend that good cause exists to amend the pleading amendment deadline because they were unaware of some of the information underlying the proposed amendments until after the deadline expired.   *Motion* [#116] at 2; *Reply* [#155] at 2. Although Defendants contest Plaintiffs' allegations that Defendants intentionally withheld certain documents and argue that the new information fails to support Plaintiffs' claims, Defendants do not appear to contest that Plaintiffs obtained at least some of the information at issue in the proposed amendments after the pleading amendment deadline passed. *See, e.g.*, *Response* [#144] at 3-5.

Plaintiffs must "show that [they have] been diligent in attempting to meet the [pleading amendment] deadline;" this standard can be met by the provision of "an

adequate explanation for any delay." *Minter v. Prime Equip. Co.*, 451 F3d 1196, 1205 & n.4 (10th Cir. 2006) (explaining that lateness itself does not justify denial of a motion to amend, but "undue" lateness does).  Plaintiffs aver that they only discovered the facts they desire to add to the Complaint after the pleading amendment deadline and that the present Motion was filed shortly thereafter.  Discovery of evidence in support of claims after the pleading amendment deadline may demonstrate good cause for extension of the deadline. *See Holland v. BP Am. Prod. Co.*, No. 12-cv-00994-REB-KLM, 2013 WL 1150954, at *1-2 (D. Colo. Mar. 19, 2013); *Granite Southlands Town Ctr. LLC v. Albert Town Ctr., LLC*, No. 09-cv-ZLW-KLM, 2010 WL 2635524, at *2 (D. Colo. June 8, 2010).

The Court is inclined to allow extension of the pleading amendment deadline here. The length of the delay is not a traditional consideration in determining whether a party has been diligent; however, the Court notes that the short delay between Plaintiffs' discovery of much of the information they seek to add and the filing of the present Motion[4] informs the Court's interpretation of Plaintiffs' conduct and whether it evidences diligence.  Further, Plaintiffs appear not to have been careless in a way that the good cause standard is meant

---

[4]   The present Motion [#116] was filed on November 22, 2013.  Plaintiffs assert that "supplemental discovery that the State Defendants finally produced on November 5, 2013—two months after the discovery was due and weeks after the deadline to amend pleadings currently in place—demonstrates that nothing has changed since the time of the audit, and school officials are motivated to hide instances of sexual assault, consistent with the actions of . . . Defendant Tutt denying [his] knowledge of sexual assaults by CS." *Motion* [#116] at 7.  The Court notes that the allegations Plaintiffs seek to add relating to this new information appear to be offered in support of their constitutional claim.  Little if any of the new information appears to be offered in support of their ADA and RA claims.  In fact, Plaintiffs have failed to adequately explain the need for discovery to assert the additional facts (which are discussed in detail below) in support of their ADA and RA claims. Examination of the proposed Second Amended Complaint and common sense indicate that those facts should have been known to Plaintiffs at the time of the filing of their original Complaint. However, Defendants fail to argue that amendments pertaining to the ADA and RA claims should be denied for failure to show good cause to amend the Scheduling Order under Rule 16(b), and the Court will not advocate on Defendants' behalf.

to address.  *See Pumpco, Inc. v. Schenker Int'l, Inc.* 204 F.R.D. 667, 668 (D. Colo. 2001).

The Court therefore finds that Plaintiffs have provided good cause for requesting leave to

amend outside the pleading amendment deadline.

**B.     Rule 15(a) Requirements**

Turning then to Rule 15(a) and whether justice would be served by permitting

amendment, in situations where the request falls outside the pleading amendment deadline

and assuming good cause is shown, leave should generally be permitted unless the moving

party unduly delayed or failed to cure, the opposing party would be unduly prejudiced, or

the proposed amendment would be futile. *Foman*, 371 U.S. at 182.  Defendants argue that

amendment should be denied based on futility.   *Response* [#143] at 2; *Response* [#144]

at 3.  An amendment is futile if it would not survive a motion to dismiss.  *Innovatier, Inc. v.

CardXX, Inc.*, No. 08-cv-00273-PAB-KLM, 2010 WL 148285, at *2 (D. Colo. Jan. 8, 2010)

(citing *Bradley v. Val-Mejias*, 379 F.3d 892, 901 (10th Cir. 2004)).   The Court addresses

Defendants' futility argument as to the ADA and RA claims first and then addresses the §

1983 claim against Defendant Tutt below.

**1.     ADA and RA Claims**

Defendants argue that Plaintiffs have failed to allege all of the necessary elements

of an ADA and a RA claim.[5]  Title II of the ADA provides that "no qualified individual with

a disability shall, by reason of such disability, be excluded from participation in or be denied

the benefits of the services, programs, or activities of a public entity, or be subjected to

---

[5]  To the extent necessary, the Court incorporates the law, analysis, and finding in the
Recommendation that Defendants are not entitled to Eleventh Amendment immunity with respect
to Plaintiffs' ADA claim.  *Recommendation* [#69] at 29-38.

discrimination by any such entity." 42 U.S.C. § 12132. To state a claim under Title II, a "plaintiff must allege that (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007) (citing 42 U.S.C. § 12132; *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006)).

Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To state a claim under Section 504, "a plaintiff must allege (1) that he is a 'handicapped individual' under the [ADA], (2) that he is 'otherwise qualified for the [benefit] sought, (3) that he was [discriminated against] solely by reason of his handicap, and (4) that the program or activity in question receives federal financial assistance." *Cohon ex rel. Bass v. N.M. Dep't of Health*, 646 F.3d 717, 725 (10th Cir. 2011) (quoting *Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1492 (10th Cir. 1992)).

As numerous Circuits have observed, "[t]he Rehabilitation Act is materially identical to and the model for the ADA," *Crawford v. Ind. Dep't of Corr.*, 115 F.3d 481, 483 (7th Cir. 1997) (citing *Bryant v. Madigan,* 84 F.3d 246, 248 (7th Cir. 1996)); *see also McDonald v. Penn. Dep't of Pub. Welfare,* 62 F.3d 92, 94 (3d Cir. 1995); *Duffy v. Riveland,* 98 F.3d 447, 455 (9th Cir. 1996)), "except that it is limited to programs that receive federal financial

assistance." *Crawford*, 115 F.3d at 483.  Accordingly, the Court evaluates Plaintiffs' ADA claim and RA claim together.  *See Jarvis v. Potter*, 500 F.3d 1113, 1121 (10th Cir. 2007) (citing 29 U.S.C. § 794(d)).

In the Recommendation, the Court found that Plaintiffs adequately alleged the first element of this claim, i.e., that Plaintiff BPS is an individual with a disability and was, by virtue of his enrollment at the School, qualified to receive the benefits and services of the School. [#69] at 39-40.   The Court incorporates the law and its analysis from the Recommendation and finds that Plaintiffs have again adequately alleged this element in the proposed Second Amended Complaint.  *See id.*

The Court previously found, however, that Plaintiffs failed to adequately allege that Plaintiff BPS "was excluded from participation in or denied the benefits of a public entity's services, programs, or activities" or that "such exclusion, denial of benefits, or discrimination was by reason of a disability."  *Id.* at 41 (quoting *Robertson*, 500 F.3d at 1193).  Defendants again argue that Plaintiffs' proposed Second Amended Complaint fails to adequately allege these two elements.  The Court addresses each in turn.

In the Recommendation, the Court found that Plaintiffs' allegations regarding the services, programs, or activities from which Plaintiff BPS was excluded or which he was denied were too vague.  [#69] at 40-41.  Plaintiffs now clearly allege the following occurred after Plaintiff BPS was sexually assaulted: (1) Defendants failed to provide Plaintiff BPS with the service of reporting the sexual assault to allow him the benefit of the operations of the local Department of Human Services; (2) Plaintiff BPS's grades suffered; (3) he suffered psychological problems, including post-traumatic stress disorder; (4) he could not focus on school work because he knew his assailant was still at large at the School; (5) he

had to repeat a grade; (6) the School refused to allow him to participate in certain programs at the School, including music and art; and (7) he ultimately withdrew from the school. *Proposed Second Am. Compl.* [#116-1] ¶¶ 134-42, 170-75.

The ADA does not define the terms "services," "programs," and "activities." *Grider v. City of Aurora*, No. 10-cv-00722-MSK-MJW, 2013 WL 3927661, at *2 (D. Colo. July 30, 2013) (citing *Frame v. City of Arlington*, 657 F.3d 215, 225 (5th Cir. 2011)).   However, these terms are generally understood by courts to mean "all of the operations of a local government." *Id.*  Denial of access to government services and benefits alone is enough to meet the second element of an ADA claim and an RA claim.  *See Grider*, 2013 WL 3927661, at *3.  Thus, Plaintiffs' allegation regarding denial of Plaintiff BPS's access to services of the local Department of Human Services is sufficient to allege that Plaintiff BPS "was excluded from participation in or denied the benefits of a public entity's services, programs, or activities." *Robertson*, 500 F.3d at 1193.  Further, as Plaintiffs discuss, similar education-related factors such as allegations (2)-(6) above have been held to support this element of ADA and RA claims.  *Reply* [#156] at 13 (citing *James S. ex rel. Thelma S. v. Sch. Dist. of Philadelphia*, 559 F. Supp. 2d 600, 621-22 (E.D. Pa. 2008) (holding that the second element of an ADA and an RA claim was met when the plaintiff alleged that the student's grades dropped, that the student was forced to repeat a grade, and that the student was denied education in an appropriate environment)).  Based on this precedent, the Court finds that Plaintiffs have adequately alleged the second element of their ADA and RA claims, i.e., that Plaintiff BPS "was excluded from participation in or denied the benefits of a public entity's services, programs, or activities." *Robertson*, 500 F.3d at 1193.

The Court next examines the third element of the ADA and RA claims, i.e., whether

"such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson*, 500 F.3d at 1193. In the prior Recommendation, [#69] at 40-41, the Court found that the Complaint's allegations were too vague to support this element. The ADA requires public entities to provide both physical and "meaningful" access to their programs and services. *Robertson*, 500 F.3d at 1195 (citing *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (holding that a prison was required to permit a deaf inmate to attend prison activities and to provide a sign language interpreter so that he could meaningfully access prison programs)). To effectuate this mandate, public entities must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

Discrimination prohibited by the ADA and the RA includes the following: "[An entity may not a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others . . . ." 34 C.F.R. § 104.4(b)(1)(ii). Here, Plaintiffs allege in part that Plaintiff BPS was not permitted the opportunity to participate in the benefits which would follow from the service of reporting the sexual assault to the local Department of Human Services, and that the denial of benefits occurred because Plaintiff BPS was blind and could not identify his attacker.[6] *See Proposed Second Am. Compl.* [#116-1] at 31 (alleging that the School did not comply with the mandatory reporting requirements regarding the sexual assault on Plaintiff BPS because Plaintiff BPS "could not identify his assailant [due] to his blindness"); *see also Reply* [#156] at 11 ("His disability makes it harder for him to identify an attacker . . . .").

---

[6] While Plaintiffs also assert that Plaintiff BPS has severe learning disabilities, they appear to base their argument solely on his visual impairment. *See, e.g.*, *Reply* [#156] at 11.

Plaintiffs allege that Defendants' failure to report the assault led to the other negative effects on Plaintiff BPS's ability to receive an education, as discussed above. *See Proposed Second Am. Compl.* [#116-1] at 32-33 ("Said discrimination in compliance with statutory mandatory reporting requirements . . . on the basis of Plaintiff's status as a disabled student at [the School] created and resulted in a hostile educational environment for [Plaintiff] BPS . . . .").

In connection with these allegations, Plaintiffs direct the Court's attention to two state laws. The first law creates an affirmative duty to report suspected sexual abuse to the local Department of Human Services and to local law enforcement. Colo. Rev. Stat. § 19-3-304(2)(*l*); *Proposed Second Am. Compl.* [#116-1] at 31. The second law creates an affirmative duty in entities like the School to promulgate rules to implement provisions of law such as mandatory reporting requirements. Colo. Rev. Stat. § 22-80-103; *Proposed Second Am. Compl.* [#116-1] at 34. Plaintiffs state that these statutes together demonstrate benefits to which Plaintiff BPS is entitled as a student of the School. *Proposed Second Am. Compl.* [#116-1] at 33-34. In other words, Plaintiffs argue that the School and the Board were prohibited under the ADA and the RA from treating Plaintiff BPS "less favorably than nondisabled individuals under the mandatory reporting requirements" of Colorado law. *Id.*

Defendants respond to this argument by stating that "state laws cannot form the basis of ADA and RA claims." *Response* [#143] at 14. In support, they cite to an Eighth Circuit Court of Appeals case, in which the court held that a Missouri statute alone could not establish the Department of Corrections' liability under the ADA and the RA. *Randolph v. Rodgers*, 170 F.3d 850, 859 (8th Cir. 1999). The court found: "The Missouri statute

creates rights and duties under Missouri state law, but cannot be used to definitively establish rights and duties under federal law." *Id.* Defendants argue that this means that "the reporting requirements of [these Colorado statutes] are irrelevant and should not be considered by this Court in determining the sufficiency of Plaintiffs' ADA and RA claims." *Response* [#143] at 14. Despite Defendants' argument, the Eighth Circuit did *not* hold in *Randolph* that state laws are irrelevant when determining the viability of claims under the ADA and the RA. Rather, that court merely held that duties created under state law were not *definitive* in determining an entity's duties under the ADA and the RA. In other words, requirements under state law *may* create a basis for liability under the ADA and the RA, depending on the circumstances of the case and whether the requirements of the ADA and the RA are otherwise met.[7]  *See Randolph*, 170 F.3d at 859 ("The defendants presented substantial evidence that [the plaintiff's] request for an interpreter created safety and security issues, as well as placed a financial burden on the prison. The Department of Corrections is entitled to have its evidence considered by the fact-finder in this case.").

Turning to the factual allegations in the proposed Second Amended Complaint, Plaintiffs have alleged that Defendants failed to provide Plaintiff BPS with the service of reporting the sexual assault, which led to the denial of the benefit of the operations of the local Department of Human Services. 34 C.F.R. § 104.4(b)(1)(ii). As stated above, the causation element of an ADA claim (and hence an RA claim) requires Plaintiffs to connect the alleged discrimination with the disability and denial of a benefit. *See Robertson*, 500

---

[7]  The Court makes no comment or finding about what Defendants were required to do under Colorado law in the circumstances present in this case. The Court only finds that state laws *may* create services and benefits to which Plaintiff BPS *may* be entitled and which he may not be denied solely on the basis of his disability.

F.3d at 1193 (stating that the third element of this claim is that "such exclusion, denial of benefits, or discrimination was *by reason of a disability*" (emphasis added)); 34 C.F.R. § 104.4(a) (stating that "[n]o qualified handicapped person shall, *on the basis of handicap*, be excluded from participation, be denied the benefits of, or otherwise subjected to discrimination under any program or activity . . . ." (emphasis added)). "The phrase 'on the basis of' requires the plaintiff to show that, but for his disability, he would have been able to access the services or benefits desired." *Grider*, 2013 WL 3927661, at *3. Here, Plaintiffs allege that personnel at the School chose not to report Plaintiff BPS's sexual assault because he could not see and identify his attacker. *Proposed Second Am. Compl.* [#116-1] at 31. Plaintiffs further allege that because Plaintiff BPS could not see his attacker, he was denied the benefits and services that access to the local Department of Human Services could have provided to him. *Id.* at 31-33. Plaintiffs also allege that this failure to report did not occur with respect to students who were sexually assaulted and who are not blind. *Id.* These allegations are sufficient to tie Plaintiff BPS's disability to the alleged discrimination under the ADA and RA.

Accordingly, the Court **recommends** that the Motion [#116] be **granted** to the extent it seeks leave to amend Plaintiffs' claims under the ADA and RA.[8]

---

[8] The Court notes that, despite finding that Plaintiffs have alleged the elements required for the ADA and RA claims, Plaintiffs must also demonstrate that they have standing to bring these two claims. "Before the plaintiff can prevail he must prove injury flowing from [the ADA violation]." *Griffin v. Steeltek, Inc.*, 160 F.3d 591, 595 n.5 (10th Cir. 1998). For example, in *D.L. v. Unified Sch. Dist. No. 497*, 596 F.3d 768, 774 (10th Cir. 2010), the Tenth Circuit Court of Appeals held that plaintiffs asserting claims under the ADA and the RA lacked standing because they could not "establish any causation between the Defendants' allegedly discriminatory conduct and any injury suffered by Plaintiffs." Here, to the extent that Plaintiffs are alleging that the discriminatory conduct was the School's failure to report the attacks to the Department of Human Services, they may be required to show that *such failure caused* Plaintiff BPS's injury (as opposed to showing that the attacks caused Plaintiff BPS's injury). Although the standing issue is noted for future reference, the

### 2.    Section 1983 Claim Against Defendant Tutt in His Individual Capacity

Defendant Tutt asserts that the Court should not permit amendment of Plaintiffs' §

1983 claim against him, because he has qualified immunity from the claim and assertion

of the claim would be futile.  *See Recommendation* [#69] at 22; *Response* [#143] at 3-11.

The Fourteenth Amendment does not impose on a state an affirmative obligation to ensure

that its citizens are not deprived of life, liberty, or property.  *See DeShaney v. Winnebago*

*Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).  There are, however, two exceptions

to this general rule: the "special relationship" doctrine and the "danger creation" theory.

*See generally Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995) (providing an overview

of the special relationship doctrine and danger creation theory).  Under both exceptions,

a state *does* have a constitutional duty to ensure that its citizens are not deprived of life,

liberty, or property.  *Id.*

In the pending Recommendation [#69], the Court found that the special relationship

doctrine did not apply to the circumstances of this case, and there appears to be no

reargument of that issue here.[9]   The parties dispute, however, whether the allegations in

the proposed Second Amended Complaint meet the requirements of the danger creation

theory.  As discussed in the pending Recommendation [#69], the danger creation theory

"applies only when a state actor affirmatively acts to create, or increases a plaintiff's

_____

Court declines to consider it on a sua sponte basis at this juncture.

[9]    To the extent necessary, the Court incorporates the law, discussion, and finding
regarding the special relationship doctrine from the pending Recommendation [#69] at 23-26.  *See
also Maldonado v. Josey*, 975 F.2d 727, 732 (10th Cir. 1992) (stating that "compulsory attendance
laws do not create an affirmative constitutional duty to protect students from the private actions of
third parties while they attend school").

vulnerability to, or danger from private violence." *Robbins v. Oklahoma*, 519 F.3d 1242, 1251 (10th Cir. 2008) (internal quotation marks omitted) (citing *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001)).  To state a prima facie case under the danger creation theory, the plaintiff must show that:

> (1) state actors created the danger or increased the plaintiff's vulnerability to the danger in some way, (2) the plaintiff was a member of a limited and specifically definable group, (3) the defendants' conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm, (4) the risk was obvious or known, (5) the defendants acted recklessly in conscious disregard of that risk, and (6) the conduct, when viewed in total, shocks the conscience.

*Robbins*, 519 F.3d at 1251 (citing *Ruiz v. McDonnell*, 299 F.3d 1173, 1182-83 (10th Cir. 2002)).

In the Motion's briefings, Plaintiffs essentially assert two theories on which to base their § 1983 claim against Defendant Tutt.  The first theory involves Defendant Tutt's alleged direct participation in enhancing the danger to Plaintiff BPS.  *See, e.g.*, *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1238-39 (10th Cir. 1999).  The Court addressed this theory in the pending Recommendation [#69] and found that Defendant Tutt's conduct did not satisfy the danger creation theory's prima facie standard because Plaintiffs did not plead facts in the Complaint adequate to meet the first and sixth elements of the standard.  The second theory involves Defendant Tutt's alleged failure to establish appropriate policies and procedures and failure to train staff, all of which enhanced the danger to Plaintiff BPS.  *See, e.g.*, *id.* at 1239-41.  The Court addresses both theories below.

### a.    Direct Participation

In the proposed Second Amended Complaint, Plaintiffs have substantially fleshed

out the allegations regarding precisely what Defendant Tutt did and did not do.  In regard

to the first element, a plaintiff must "demonstrate affirmative conduct on the part of the

State Defendants that created or increased the danger . . . .  Affirmative conduct for

purposes of § 1983 should typically involve conduct that imposes an immediate threat of

harm, which by its nature has a limited range and duration."  *Ruiz,* 299 F.3d at 1183;

*accord L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) (noting that invocation of the

danger creation theory "necessarily involves affirmative conduct on the part of the state in

placing the plaintiff in danger").  Defendant Tutt's conduct must be "intentional or reckless"

in order to hold him liable based on the injuries caused by CS, a private individual.  *Sutton*,

173 F.3d at 1238.  Nonfeasance is insufficient to satisfy the first element of the danger

creation theory's prima facie standard.  *See id.* at 1238 n.13 (citing *Graham v. Indep. Sch.*

*Dist. No. I-89*, 22 F.3d 991, 995 (10th Cir. 1999)).

The parties argue about whether Plaintiffs have sufficiently alleged affirmative

conduct by Defendant Tutt which imposed an immediate threat of harm on Plaintiff BPS.

*See Ruiz*, 299 F.3d at 1183.  Plaintiffs do not argue that Defendant Tutt intentionally

created a dangerous situation for Plaintiff BPS, one which ultimately led to his injuries.

Thus, this claim depends on whether Plaintiffs have sufficiently alleged reckless conduct

by Defendant Tutt.  *See Sutton*, 173 F.3d at 1238.  An "'act is reckless when it reflects a

wanton or obdurate disregard or complete indifference to risk,' and that reckless intent is

established if the state 'actor was aware of a known or obvious risk that was so great that

it was highly probable that serious harm would follow and he or she proceeded in conscious

and unreasonable disregard of the consequences."  *Id.* (quoting *Medina v. City & Cnty. of*

*Denver*, 960 F.2d 1493, 1496 (10th Cir. 1992)).  Finally, the allegations in the complaint

must adequately allege that the affirmative conduct *caused* the harm inflicted on the victim by the private party. *Gray v. Univ. of Colo. Hosp. Authority*, 672 F.3d 909, 917 (10th Cir. 2012).

To begin, the Court summarizes some of the facts, allegations, and holdings in relevant case law in which affirmative conduct in connection with the danger creation theory has been discussed. In *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989), a police officer impounded the female plaintiff's car and abandoned her in a high crime area in the middle of the night, after which she was raped. The police officer's action of impounding the car was found to be affirmative action. *See Sutton*, 173 F.3d at 1237 n.12 (citing *Wood* as the "classic 'danger creation' case"). In *DeShaney*, 489 U.S. at 193, 197, a child alleged that after promising to protect him, a state social service agency and its employees failed to intervene to protect him against violence from his father. The court found that these allegations merely demonstrated a failure to act rather than any affirmative act, as required. In *Graham*, 22 F.3d at 995, two mothers failed to allege affirmative action "that created or increased the danger to the victims" when public school officials failed to protect their sons from the violent acts of other students, despite known dangers. In *Uhlrig*, 64 F.3d at 659-72, state mental health administrators terminated a unit in a mental hospital reserved for criminally insane inmates, after which one of those inmates killed an employee. However, the employee's estate failed to establish that the state actors acted "recklessly" by terminating the special unit.

In *Sutton*, 173 F.3d at 1239, the Court noted that a teacher's aide (who was not a party to the lawsuit), and not the principal, placed the student plaintiff in danger of further sexual assault by leaving the student plaintiff alone in the bathroom when the aide left to

answer the telephone.  The Court found that the principal did not engage in any reckless affirmative act designed to harm the student plaintiff when he: (1) sought to provide protection to the student plaintiff while he used the bathroom after being notified that the student had previously been molested, and (2) told the student plaintiff's mother that he would not be permitted to use the bathroom unattended.  The Court found that the principal's actions did not personally, affirmatively place the student plaintiff in any danger.

In *DeAnzona v. City and County of Denver*, 222 F.3d 1229, 1234 (10th Cir. 2000), the plaintiffs did not allege affirmative action by the state, but instead merely alleged that failures to train counselors and to institute precautionary measures led to the death of their child when he drowned in a lake at a city-run day camp.  In *Ruiz*, 299 F.3d at 1183, the state defendants affirmatively acted to license a home daycare where the operator of the daycare later abused a child to death.  However, the act of licensing did not place the child at substantial risk of immediate and proximate harm.  In *Robbins*, 519 F.3d at 1251-52, an infant died in a state-subsidized daycare, but the Tenth Circuit found that negligence in licensing was not a sufficiently affirmative act because it did not pose an immediate threat of harm.  The court further held that the parents' claims that the state defendants lulled them into a false sense of security based on misrepresentations also did not give rise to a claim for relief.  In *Gray*, 672 F.3d at 925, the state defendants' "untruthful assurances" of safety to the plaintiff and his family and adoption of generally-applicable policies and customs did not meet the "affirmative conduct" threshold for liability.

In their Second Amended Complaint, Plaintiffs attempt to recast many of the instances of Defendant Tutt's alleged nonfeasance into affirmative acts.  For example, they allege that he made an affirmative decision not to investigate a sexual assault at the

School, affirmative decisions not to adopt or implement polices and procedures to teach the staff, and an affirmative decision not to make formal reports of the incidents. However, merely placing the word "affirmative" before each statement does not transform alleged inaction into action. Each of these instances are examples of nonfeasance, where Defendant Tutt chose not to take a particular course of conduct. *See, e.g.*, *Response* [#143] at 5-6 (citing to instances of Defendant Tutt's nonfeasance as alleged in the proposed Second Amended Complaint). Significantly, by not acting, Defendant Tutt did not create or increase the danger of sexual assault to students at the School. Rather, the danger merely continued unabated and unquelled. As the Tenth Circuit Court of Appeals has made clear, this is not enough. *See Graham*, 22 F.3d at 995 (holding that two mothers failed to state a claim that public school officials breached a constitutional duty to protect their sons from the known danger of violent acts of other students by failing to take action designed to ensure their sons' safety); *see also DeShaney*, 489 U.S. at 193, 199-200 (holding that a state social service agency and its employees did not commit a constitutional violation by failing to intervene to protect a child from the risk of violence by his father, a risk of which they allegedly knew or should have known). As the Court noted in the Recommendation, [#69] at 27, "such nonfeasance may well sound in negligence," but it does not mean that Defendant Tutt took any intentional or reckless affirmative action that created or increased danger to Plaintiff BPS or other students at the School.

In a few instances, Plaintiffs do allege conduct by Defendant Tutt that could be construed as affirmative action, such as telling others that student-on-student assaults had been properly reported. *See, e.g.*, *Response* [#143] at 7 (citing to instances of Defendant Tutt's conduct that could be construed as affirmative, as alleged in the proposed Second

Amended Complaint); *Reply* [#156] at 4-5. However, cases such as *DeShaney*, *Graham*, and *Robbins* demonstrate that these sorts of statements are simply not enough to meet the affirmative conduct threshold, especially when such conduct fails to fulfill the other requirements of the danger-creation theory by causing serious, immediate, and proximate harm. The Court has carefully examined the proposed Second Amended Complaint for allegations regarding instances of affirmative conduct by Defendant Tutt that meet the standards provided by the Tenth Circuit Court of Appeals. However, it has found none. Without more, the Court cannot find that Plaintiffs have sufficiently alleged that Defendant Tutt can be held personally liable for violating their civil rights under § 1983 by his direct participation in creating or enhancing danger to Plaintiff BPS. Thus, amendment of the Fourteenth Amendment § 1983 claim against Defendant Tutt on a direct participation theory would be futile.

### b.    Adoption of Policies/Procedures and Training of Staff

Plaintiffs' second theory of liability against Defendant Tutt relies on the holding in *Sutton* that a school principal may be liable for his failure to train staff and failure to adopt policies and implement procedures designed to prevent the sexual assault of a particular student at his school. *See, e.g.*, *Reply* [#156] at 9. The Court finds that the Tenth Circuit Court of Appeals' recent decision in *Gray v. University of Colorado Hospital Authority*, 672 F.3d 909 (10th Cir. 2012), is instructive here. The *Gray* court embarked on a thorough review of the state-created danger theory, beginning with the theory's inception in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989). As part of this review, the *Gray* court directly addressed the constitutional implications of *Sutton*'s holding regarding the state-created danger theory and a supervisor's failure to

train staff, failure to adopt certain policies, or failure to implement certain procedures:

> As an alternative to our holding in *Sutton* that the principal on the facts alleged could not be liable for his "direct participation in enhancing the danger" to the child, we held the principal could be liable on those same facts for his inaction in failing "to adequately train school employees or adopt or implement a policy to prevent sexual assaults like those against [the child]." *Sutton*, 173 F.3d at 1238-39. This approach to the principal's accountability might well have succeeded under a theory of supervisory liability, if the mother first was able to establish an underlying constitutional violation on the part of the teacher's aide or other state actor. *See, e.g., City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam) (holding that if a police officer inflicted no constitutional injury on a suspect, "it is inconceivable" that the police commissioners could be liable to the suspect); *Morris v. Lanpher*, 563 F.3d 399, 403 (8th Cir. 2009) (recognizing that without an underlying constitutional violation, a § 1983 claim for failure to supervise "necessarily fails"); *see also Currier v. Doran*, 242 F.3d 905, 922-23 (10th Cir. 2001) (relying on *Sutton* to uphold a claim for failure to supervise against a child welfare supervisor as part of a complaint that also adequately alleged an underlying constitutional violation against subordinate social workers based on danger creation); *cf. Martinez v. Beggs*, 563 F.3d 1082, 1092 (10th Cir. 2009) (holding a sheriff could not be liable for implementing county policies where no underlying violation of decedent's rights had occurred). We believe *Sutton* recognized the requirement that supervisory liability be premised on an underlying constitutional violation. We take this view of *Sutton* for two reasons. First, *Sutton* exclusively relied on cases involving claims of municipal or supervisory liability arising out of a subordinate's allegedly unconstitutional conduct. *See Sutton*, 173 F.3d at 1239-41 (discussing *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Green v. Branson*, 108 F.3d 1296 (10th Cir. 1997); *Meade v. Grubbs*, 841 F.2d 1512 (10th Cir. 1988); *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990)). Second, *Sutton* made plain not once, not twice, but three times, that in reaching its decision regarding the principal's alleged failure to supervise, it was construing the complaint pursuant to the now defunct and "best forgotten" *Conley* standard. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *overruled by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562-63, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). That standard purported to prohibit a complaint's dismissal for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Sutton*, 173 F.3d at 1239 (quoting *Conley* 355 U.S. at 45-46, 78 S.Ct. 99); *see also id.* at 1236, 1241. To be sure, confusion may arise from *Sutton*'s reference to the mother's failure to supervise theory as a "variation[ ] of the 'danger creation' doctrine." *Id.* at 1237-38. But if that was literally true, *Sutton* would be difficult if not impossible to square with the precedents by which it was bound, in

particular *DeShaney* and *Graham*. *DeShaney* told us that absent a custodial relationship, a State's failure to protect a child from private violence does not violate the Due Process Clause. *DeShaney*, 489 U.S. at 197, 109 S.Ct. 998. And *Graham* told us that the "state-created danger doctrine necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger," and that "inaction by the state in the face of a known danger is not enough" to invoke the protections of the Due Process Clause. *Graham*, 22 F.3d at 995 (internal quotations omitted). To the extent *Sutton* may be said to conflict with these decisions, *Sutton* would have no precedential effect. See *Utah Envtl. Cong. v. Troyer*, 479 F.3d 1269, 1292 (10th Cir. 2007) (stating the rule that where Tenth Circuit panel decisions conflict, the earliest decision controls). We need not definitively resolve the tension between *Sutton* and our prior precedents addressing the state-created danger theory, however, because Plaintiffs in this case do not raise *Sutton*'s alternative theory of relief as part of their danger creation claim.

*Gray*, 672 F.3d at 918 n.7.

Plaintiffs attempt to distinguish *Gray* by stating that the plaintiffs there "alleged only medical malpractice by state actors, but no private act of violence," and so "*Gray* has nothing to do with this case or *Sutton*" and that "[a]ny comments from *Gray* about *Sutton* were mere *dicta* at best." *Reply* [#156] at 9. While the Court agrees that one of the ultimate holdings in *Gray* was that there was no private act of violence, 672 F.3d at 930, and that the statement quoted above is dicta, the Court disagrees with Plaintiffs' statement that *Gray* has no bearing on the present case or on *Sutton*. Dicta, of course, is not binding on the Court. *United States v. Villarreal-Ortiz*, 553 F.3d 1326, 1328 (10th Cir. 2009) (citing *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1184 (10th Cir. 1995) (explaining that dicta are statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand); *Bates v. Dep't of Corr.*, 81 F.3d 1008, 1011 (10th Cir. 1996) ("[A] panel of this Court is bound by a holding of a prior panel of this Court but is not bound by a prior panel's dicta."). However, the Tenth Circuit has clearly established that dicta from an appellate court decision should be treated

with great deference.  *See, e.g.*, *United States v. Nelson*, 383 F.3d 1227, 1232 (10th Cir. 2004) ("We do not . . . approach opinions of the Supreme Court with a view to reaching the narrowest construction possible.  Instead, we have said that 'this court considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements.'" (quoting *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996)).  Here, the Court finds that the dicta at issue is recent (2012) and not "enfeebled by later statements."  *Gaylor*, 74 F.3d at 217.  In the absence of arguments demonstrating that the *Gray* court's dicta is inapplicable or illogical as applied to the present case, the Court "considers itself bound by [Tenth Circuit] dicta."  *Id.*

Turning to the substance of the *Gray* court's opinion regarding *Sutton* and applying it to the allegations of the present case, the primary implication is that, in order to hold Defendant Tutt liable under § 1983 and the state-created danger theory in connection with his failure to train staff, failure to adopt certain policies, or failure to implement certain procedures, Plaintiffs must allege an underlying constitutional violation on the part of some state actor who is subordinate to Defendant Tutt.  As the *Gray* court discussed, the *Sutton* court did not address whether the plaintiffs there sufficiently alleged that a specific staff member committed a constitutional violation based on the principal's failure to train or failed policies/procedures.  However, as the *Gray* court also noted, the *Sutton* court emphasized three times in its discussion on this issue that it was deciding the case using the now-outdated dismissal standard of *Conley v. Gibson*, 355 U.S. at 45-46, i.e., dismissal should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

-24-

As noted above, an amendment is futile if it would not survive a motion to dismiss. *Innovatier, Inc.*, 2010 WL 148285, at *2. Jurisprudence regarding the sufficiency of allegations in a complaint has evolved since *Conley*. When reviewing whether the allegations of a complaint would survive a motion to dismiss on the merits pursuant to Fed. R. Civ. P. 12(b)(6), the Court determines "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed. R. Civ. P. 12(b)(6) (stating that a complaint may be dismissed for "failure to state a claim upon which relief can be granted"). To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'" *Robbins*, 519 F.3d at 1247 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) ("The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations." (quoting *Twombly*, 550 U.S. at 570)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks omitted).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant has acted unlawfully." *Id.* (citation omitted). As the Tenth Circuit has explained, "the mere metaphysical possibility that some plaintiff

could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  However, "[t]he court's function on a 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton*, 173 F.3d at 1236 (10th Cir. 1999) (citation omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Iqbal*, 556 U.S. at 678.

After carefully reviewing Plaintiffs' proposed Second Amended Complaint, the Court finds that Plaintiffs have failed to allege an underlying constitutional violation on the part of a state actor who is subordinate to Defendant Tutt.[10]  Indeed, the allegations of the Second Amended Complaint explicitly identify a non-state actor, CS, as the individual who assaulted Plaintiff BPS.  Although Plaintiffs name certain staff members of the School and allege that there was "confusion among CSDB personnel regarding the existence and meaning of CSDB policies and procedures governing the reporting of criminal or sexual acts by students," Plaintiffs fall far short of alleging an underlying constitutional violation by any specific staff member.  *See Proposed Second Am. Compl.* [#116-1] ¶¶ 84-89.  The *Sutton* court did not explain what type of facts would support a constitutional violation by a subordinate staff member while discussing the claim of failure to adequately train school employees or adopt a policy to prevent sexual assault.  However, the court mentioned in

---

[10]  The Court does not imply that the subordinate state actor who allegedly commits the underlying constitutional violation must be a party to the lawsuit.  *See Sutton*, 173 F.3d at 1239.

the opinion that, despite warnings that the student plaintiff should not be permitted to use the bathroom alone because of a prior sexual assault in that location, the teacher's aide who was accompanying the student "abandoned her post in order to answer a telephone," at which time the student was again sexually assaulted by a fellow student. *Sutton*, 173 F.3d at 1230; *see also id.* at 1239 (stating that the teacher's aide affirmatively placed the student in danger by leaving him to answer the phone). Here, Plaintiffs have not provided allegations against a specific staff member subordinate to Defendant Tutt which the Court could construe as a constitutional violation. Thus, the Court cannot find that Plaintiffs have met the facial plausibility standard required to assert this § 1983 claim against Defendant Tutt for failure to train, failure to adopt certain policies, or failure to implement certain procedures. *See Iqbal*, 556 U.S. at 678; *see also Sutton*, 173 F.3d at 1239 (stating that "strict standards of substantive due process [are] employed under § 1983" when determining the viability of a danger creation claim).

Accordingly, the Court **recommends** that the Motion be **denied** on the basis of futility insofar as Plaintiffs seek to amend their § 1983 claim against Defendant Tutt in his individual capacity.

## C. John Doe Defendants

The Court sua sponte here addresses the issue of "Does 1-10" who are named as John Doe Defendants in this lawsuit.

First, the Court recommends that Plaintiffs' claim of sexual harassment in violation of Title IX remain in this action. *See Proposed Second Am. Compl.* [#116-1] ¶¶ 155-65. Plaintiffs do not clearly identify against whom this claim is made. *See id.* However, Title

IX does not authorize suit against school officials, teachers, or other individuals. *Fitzgerald v. Barnstable Sch. Committee*, 555 U.S. 246, 257 (2009). Thus, even were Plaintiffs to identify the individual John Doe Defendants in their Title IX claim, the claim could not properly be asserted against them. *See Saffron v. Wilson*, 70 F.R.D. 51, 56 (D.D.C. 1975) (dismissing the plaintiff's *Bivens* claims against John Doe defendants because the claims were precluded by federal statute), *aff'd in part and rev'd in part on other grounds*, 333 F.3d 273 (D.C. Cir. 2003).

Second, and similarly, "the proper defendant in a Title II claim [under the ADA] is the public entity itself or an official acting in his or her official capacity." *Hicks v. Keller*, No. 11-cv-0422-WJM-KMT, 2012 WL 1414935, at *6 (D. Colo. April 24, 2012). Thus, Plaintiffs may not bring the ADA or RA claim against any person acting in his or her individual capacity. *See Richardson v. Butler*, No. 12-cv-02912-REB-CBS, 2014 WL 700177, at *14 (D. Colo. Feb. 20, 2014) (dismissing ADA claim against the defendants in their individual capacities). Additionally, to the extent that any John Doe Defendant may be an employee of the School or the Board, an official capacity claim under the ADA or RA against him or her would be redundant of the claims against the School and the Board. *See Hicks v. Keller*, No. 11-cv-0422-WJM-KMT, 2012 WL 1414935, at *6 (D. Colo. April 24, 2012).

Third, Plaintiffs' § 1983 claim is brought expressly against only Defendant Tutt, and thus appears to have no relationship to the John Doe Defendants. *Proposed Second Am. Compl.* [#116-1] at 24. Plaintiffs have made no effort since the instigation of this lawsuit to name the John Doe Defendants. "[P]ursuant to Fed. R. Civ. P. 10(a), a caption to a complaint must include the names of all parties." *Culp v. Williams*, No. 10-cv-00886-CMA-CBS, 2011 WL 1597686, at *3 (D. Colo. April 27, 2011) ("*Culp I*"), *aff'd*, 456 F. App'x 718

(10th Cir. 2012) ("*Culp II*"). It is Plaintiffs' responsibility to diligently work to obtain the identities of such individuals. *See, e.g.*, *Kabyesiza v. Rodriguez*, No. 10-cv-00216-MSK-KLM, 2010 WL 3923093, at *4 (D. Colo. Oct. 1, 2010) (denying a plaintiff early discovery because he "failed to demonstrate appropriate diligence in his efforts to prosecute his case" such as making "any reasonable efforts to identify the alleged wrongdoers or to serve them with process"). The "Federal Rules of Civil Procedure do not explicitly allow the naming of fictitious or anonymous parties in a lawsuit [and therefore] 'an action may be dismissed if the defendant is not sufficiently identified to permit service of process.'" *Culp I*, 2011 WL 1597686, at *3 (quoting *Stratton v. City of Boston*, 731 F. Supp. 42, 45 (D. Mass. 1989)); *see also* 2 James Wm. Moore *et al.*, Moore's Federal Practice § 10.02[2][d] at 10-16 (3d ed. 2010) ("The court will not permit use of the 'Doe' designation for a defendant if the plaintiff's ignorance of the defendant's true identity is the result of willful ignorance or lack of reasonable inquiry. If reasonable inquiry would have revealed the true identity, a pleading naming John Doe defendants will be dismissed.").

The Court should only allow claims against parties whose names are unknown to proceed "if the complaint makes allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery." *Hartley v. Wilfert*, 931 F. Supp. 2d 230, 233 (D.D.C. 2013). This lawsuit was filed on October 9, 2012. *Compl.* [#1]. Discovery in this matter opened on March 14, 2013. *Minute Entry* [#45]; *Civil Scheduling Order* [#46]. Plaintiffs have now had more than eighteen months since the beginning of this lawsuit and more than a year of discovery in which to obtain the identities of the John Doe Defendants, serve them with the Complaint, and thus make them parties to this lawsuit. They have failed to do so. Pursuant to Fed. R. Civ. P. 4(m), the deadline for service on the

John Doe Defendants has long since expired.  At this stage, it is clear that Plaintiffs cannot provide the necessary information to effect service on the John Doe Defendants.

Accordingly, the Court **recommends** sua sponte that all claims against the John Doe Defendants be **dismissed without prejudice** and that they be dropped as Defendants from this lawsuit.  *See Culp II*, 456 F. App'x at 720 (affirming dismissal of claims against John Doe defendants); *Culp I*, 2011 WL 1597686, at *4 (dismissing claims against John Doe defendants "due to Plaintiff's failure to identify properly these Defendants").

### III.  Conclusion

Based on the above,

IT IS HEREBY **RECOMMENDED** that the Motion [#116] be **GRANTED in part and DENIED in part**, as follows.  The Court **recommends** that the Motion [#116] be **granted** to the extent that Plaintiffs be permitted to file the proposed Second Amended Complaint (1) to more fully allege the factual basis for their case, (2) to assert the Second Claim of sexual harassment in violation of Title IX against the School and the Board, (3) to amend their ADA and RA claims, and (4) to drop the § 1983 claims against the School, the Board, and Defendant Tutt in his official capacity.[11]  The Court **recommends** that the Motion [#116] be **denied** on the basis of futility to the extent that Plaintiffs seek to amend their § 1983 claim against Defendant Tutt in his individual capacity.[12]

---

[11]  If the present Recommendation is adopted, this necessarily means that the portions of the Motions to Dismiss [#16, #17] and prior Recommendation [#69] which address the § 1983 claims against the School, the Board, and Defendant Tutt in his official capacity would also be moot, except to the extent incorporated herein.

[12]  The Court thus continues to recommend that this claim be dismissed from this lawsuit for the reasons stated both in the prior Recommendation [#69] and in the present Recommendation.

IT IS FURTHER **RECOMMENDED** sua sponte that all claims against Does 1-10 be **DISMISSED without prejudice** and that they be dropped as Defendants from this lawsuit.[13]

IT IS HEREBY **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.   A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b);  *Thomas v. Arn*, 474 U.S. 140, 147-148 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999);  *Talley v. Hesse*, 91 F.3d 1411, 1412-1413 (10th Cir. 1996).   A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.  *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated:  April 28, 2014

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge

---

[13]   Thus, if this Recommendation and the prior Recommendation [#69] are adopted in material part, the remaining claims in this lawsuit will be under the ADA, the RA, and Title IX against the School and the Board.