**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 12-cv-02664-RM-KLM

BPS, a Minor and Disabled Person,
KATRINA L. STEWART, his Parent and Next Friend, and
JOHN P. STEWART, his Parent and Next Friend,
MAP, a Disabled and Incompetent Person, and
CORINA S. SKINNER, his Guardian, Parent and Next Friend,

      Plaintiffs,

v.

BOARD OF TRUSTEES FOR COLORADO SCHOOL FOR THE DEAF AND BLIND, and
COLORADO SCHOOL FOR THE DEAF AND BLIND,

      Defendants.

---

## ORDER

---

    This consolidated matter is before the Court on Defendants Board of Trustees for the

Colorado School for the Deaf and Blind ("Board") and Colorado School for the Deaf and Blind's

("School" or "CSDB") motion for summary judgment (ECF No. 254).  In this consolidated

matter, Plaintiffs BPS, Katrina L. Stewart ("K. Stewart"), and John P. Stewart ("J. Stewart")

brought suit against Defendants for violating:  (1) Title IX of the Education Amendments of

1972 ("Title IX"), 20 U.S.C. §§ 1681-1688 (ECF No. 301 ¶¶ 155-165); (2) Title II of the

Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, (ECF No. 301 ¶¶ 166-

181); and (3) Section 504 of the Rehabilitation Act ("Rehabilitation Act"), 29 U.S.C. § 794(a)

(ECF No. 301 ¶¶ 166-181).  Similarly, Plaintiffs MAP and Corina S. Skinner ("Skinner")

brought suit against Defendants for the same statutory violations.  (ECF No. 300 ¶¶ 178-204.)

For the following reasons, the Court GRANTS, in part, and DENIES, in part, Defendants' motion for summary judgment (ECF No. 254).

## I.    BACKGROUND[1],[2]

This consolidated matter involves student-on-student sexual harassment and Defendants' response (or lack thereof) to it.  Because of the variety of citation problems in the parties' summary judgment submissions, the Court sets forth the basic factual and procedural background at the outset.  Further analysis of the material facts is set forth in the Analysis section, *infra*.

### A.    Relevant Factual Background

#### 1.    The Parties

The School is a state school operating under the auspices of the Colorado Department of Education and its services are free of charge to qualifying students and their families.  (*See* ECF No. 256-1 at 5, Vigne Dep. 70:14-18.)  The School is charged with serving the educational needs of deaf and visually impaired students.  (*See* ECF No. 256-2 at 3-4, Hilty Dep. 15:20-25, 16:1-16.)  The School receives federal funds.  (ECF No. 256-3 at 2, Hilty Aff. ¶ 8.)  The Board is statutorily authorized to apply for and receive federal funds for managing the School.  Colo. Rev. Stat. § 22-80-103(4)(d).

BPS is visually impaired and enrolled at the School as a student in 2005 at age 5.  (ECF No. 256-4 at 2, K. Stewart Dep. 60:15-21; ECF No. 290 ¶ 4.)  MAP is visually impaired and has

---

[1] Both parties fail to properly authenticate, via an affidavit, declaration, or deposition testimony, many of the documents submitted in support of or in opposition to summary judgment.  (*See* Dkt.)  Therefore, if a document is relied upon by a party as material and is material to the Order, the Court will consider the contents of it only if they are admissible.

[2] There is a recurring theme with the parties' factual submissions that rely upon reports to adults or investigating officers.  This is classic hearsay which is insufficient to either support or refute a party's entitlement to summary judgment.  However, where the parties do not dispute the essential act's occurrence, *i.e.*, "inappropriate touching" of some kind which the School's Policy defines as sexual abuse (ECF No. 256-8 at 3, E-mail from C. Lutz to V. Crim, 11/7/12), the Court, in the interest of manifest justice, will consider the fact undisputed only for the purpose of considering Defendants' motion for summary judgment.

been diagnosed with learning and developmental disabilities, including cerebral palsy and

impulse control disorder.  (ECF No. 290 ¶ 5.)  MAP enrolled at the School in 2009 at age 14.

(ECF No. 290 ¶ 5; ECF No. 256-5 at 2, Skinner Dep. 34:13-20.)

> 2.     The School's Child Abuse Policies and Training

At the relevant time, the School had a written policy governing child abuse reporting

which is entitled "Reporting Child Abuse/Child Protection" (the "Policy").  (ECF No. 256-6 at 1-

2, JLF-R Revised 11/29/05; ECF No. 256-7 at 1-5, JLF-R, Revised 1/22/12; ECF No. 256-2 at 5-

10, Hilty Dep. pp. 18-23.)  The School's Policy is e-mailed to staff yearly.  (ECF No. 256-8 at 1,

E-Mail from C. Lutz to V. Crim 11/7/12; ECF No. 256-1 at 7-8, Vigne Dep. 114:9-25, 115:1-10;

ECF No. 256-9 at 4-5, Elstad Dep. 44:14-25, 45:1-22.)  In 2009-2010, existing School staff was

required to participate in annual child abuse training.  (ECF No. 256-9 at 6-7, Elstad Dep. 54:8-

25, 55:1.)  During this training, the School presented a power point presentation.  (*See* ECF No.

258-1, Child Abuse Reporting PowerPoint; ECF No. 256-10 at 3, CSDB's Resp. to First Set of

Interrog. No. 2(a); ECF No. 256-11 at 3-4, CSDB's Supp. Resp. to First Set of Interrog. No.

2(a).)

The School has three reporting forms for documenting and reporting student-conduct

issues and incidents:  (1) Office Disciplinary Referrals ("ODR") which are used for minor

behavioral incidents; (2) Incident Reports ("IR") which are used for injuries, repeat behaviors or

significant incidents such as physical altercations; and (3) Critical Incident Reports ("CIR"), also

known as Child Abuse Reporting Forms, which are used to document suspected child abuse,

including student-on-student sexual abuse, and are used when incidents are reported to the

Colorado Department of Human Services ("DHS") as well as provided to Superintendent Carol

Hilty ("Hilty").  (ECF No. 256-2 at 10-18, Hilty Dep. 23:10-25, pp. 25-31; ECF No. 277-23 at 3,

Hilty Dep. 29:19-25, 30:1-10.)  The School's staff is trained on the appropriate uses of the various reporting forms.  (ECF No. 256-2 at 17-18, Hilty Dep. 30:19-25, 31:1-6.)  CSDB employees must report suspected child abuse (which includes sexual assault) to DHS, contact a supervisor, and fill out a CIR.  (ECF No. 256-7 at 1-2, Child Abuse Policy §§ I(A)-(C), II(B).)  "All employees of CSDB are mandatory reporters of child abuse."  (ECF No. 256-6 at 1, JLF-R Revised 11/29/05.)  At the top of an Incident Report is a statement that indicates that they are not to be used for child abuse reporting.  (*See* ECF No. 256-24, Student Incident Report 10/7/11.)

The School also had a requirement that deemed students ineligible to enroll if they demonstrate, in pertinent part, unpredictable assaultive behavior and/or a pattern of predictably assaultive behavior directed towards peers.  (ECF No. 277-29 at 1, Admission and Denial of Admission.)

The School also had a disciplinary policy which applied to individuals engaging in sexual misconduct or behavior which is detrimental to the welfare, health, or safety of other students. (ECF No. 277-30 at 2-3, Suspension/Expulsion of Students.)

The School's dorm staff employees, including Lori Hall ("Hall"), Dan Spigarelli ("Spigarelli"), and Tyrone Threats ("Threats"), participated in training for child abuse training at CSDB.  (ECF No. 256-13 at 2, Hall Dep. 33:10-23; *see* ECF No. 256-14 at 2-3, Spigarelli Dep. pp. 82-83; ECF No. 256-15 at 2-3, Threats Dep. pp. 67-68.)

      3.    <u>CS</u>

CS enrolled in the School in 2008 when he was approximately twelve years old.  (ECF No. 290 ¶ 15.)  Prior to CS's enrollment in the School, CS's mother, VS, sent an e-mail to School psychologist Ellen Trapp ("Trapp").  (*See* ECF No. 256-17, E-mail from VS to Trapp 5/19/08.)  In her May 2008 e-mail, VS advised Trapp that in early 2008 she observed CS with his

younger brother and the younger brother had his pants down.  (ECF No. 256-17, E-mail from VS to Trapp 5/19/08.)  VS reported the incident between CS and his younger brother to CS's treating physician.  (ECF No. 256-17, E-mail from VS to Trapp 5/19/08.)  The incident was reported to Boulder County Department of Human Services which investigated the matter and assigned a caseworker.  (ECF No. 256-17, E-mail from VS to Trapp 5/19/08.)  The outcome of the Boulder County Department of Human Services investigation into the 2008 incident between CS and his brother was "inconclusive."  (ECF No. 256-18 at 1, El Paso Cty. DHS Trails Sys. Report 3/30/10 p.2.)

          a.    *Rooming*

After CS enrolled in the School, in October 2008, VS e-mailed Trapp and suggested that it might be better if CS were to switch roommates[3].  (ECF No. 256-19 at 1, E-mail from VS to Trapp 10/8/08.)  VS was concerned about CS's having a roommate younger than him.  (ECF No. 256-19 at 1, E-mail from VS to Trapp 10/8/08.)  Trapp shared the information she received from VS with Kathy Hegeman ("Hegeman") who was employed in the School's Dorm.  (ECF No. 256-20 at 5, 16; Trapp. Dep. pp. 47-50, pp. 70-71, 98:12-25, pp. 99-101.)  Dorm staff, including Hall, Threats, and Spigarelli, was each made aware of VS's concerns about CS.  (ECF No. 256-13 at 5-10, Hall Dep. pp. 38-44; ECF No. 256-15 at 4-7, pp. 104-107.)

On August 12, 2009, VS sent an e-mail to Trapp in which she sought that CS be given his own room.  (ECF No. 256-21, E-mail from VS to Trapp 8/12/09.)  Prior to the start of the 2009-2010 school year, Trapp e-mailed Hegeman to request that CS be reassigned from his anticipated room with "NF" and inquired if he could be placed in his own room.  (ECF No. 256-22, E-mail from Trapp to Hegeman 8/13/09.)  At the beginning of the 2009-2010 school year, Threats

---

[3] Defendants state that VS, in the at-issue e-mail, requested that CS be assigned his own room.  (ECF No. 290 ¶ 17.) The record cited does not support this contention.

assigned CS to a dorm (Ritter West 1) for high school aged children.  (ECF No. 256-15 at 8-9,

Threats Dep, pp. 143-44.)  In the fall of 2009, MAP and CS were assigned to separate bedrooms

in a suite with a shared bathroom in the Ritter West 1 dormitory.  (ECF No. 256-15 at 8-9,

Threats Dep. pp. 143-44.)  In November 2009, Threats reassigned MAP to a different room.

(ECF No. 256-15 at 11, Threats Dep. 150:18-25, pp. 151-154.)  Threats reassigned MAP to share

a suite with "JC."  (ECF No. 256-15 at 12, 15, Threats Dep. 150:18-25, pp. 151-54.)  After that

reassignment, CS and MAP roomed on opposite ends of floor 1 of the Ritter dormitory.  (ECF

No. 256-15 at 11-15, 150:18-25, pp. 151-154.)  The School did not inform MAP's mother that

MAP had changed rooms.  (ECF No. 277-2 at 8, Skinner Dep. 80:21-25, 81:1-22.)  Although

MAP and CS were no longer sharing a suite in the dormitory, MAP's mother, in 2011, observed

CS in MAP's doorway twice subsequent to the room reassignment.  (ECF No. 277-2 at 9,

Skinner Dep. 132:15-25, 133:1-25, 134:1-2.)

At the School, a rule prohibited students from being in each other's rooms.  (ECF No.

277-3 at 8, Threats Dep. 163:25, 164:1-10.)

b.     *Sexual Abuse*

The School's Policy identifies that its employees should report a reasonable suspicion of

the following:  "[s]exual abuse:  vaginal, anal, or oral intercourse; vaginal or anal penetrations;

*and other forms of inappropriate touching* or exhibitionism for sexual gratification."  (ECF No.

256-8 at 3, E-mail from C. Lutz to V. Crim, 11/7/12.) (Emphasis added.)

(1)     Between CS and MAP

At some point[4], CS sexually abused MAP.  (ECF No. 277-5 at 2, MAP Dep. 30:9-19.)

CS came into the bathroom and tried to have sex with MAP.  (ECF No. 277-5 at 2, MAP Dep.

30:12-14.)  CS attempted to take MAP's pants down.  (ECF No. 277-5 at 2, MAP Dep. 31:4-6.)

MAP "tried to tell [CS] to quit it."  (ECF No. 277-5 at 2, MAP Dep. 30:17-19.)  CS continued in

his abuse until Threats came into the bathroom and told CS to stop.  (ECF No. 277-5 at 2, MAP

Dep. 30:21-23.)

During an investigation by Pueblo County DHS and law enforcement, MAP reported that

CS had performed some type of sexual activity on him and CS asked to "suck his penis."  (ECF

No. 256-18 at 2-3, El Paso Cty. DHS Trails Sys. Report 3/30/10 pp. 2-3; ECF No. 256-5 at 8-11,

Skinner Dep. pp. 64-67.)

(2)     Between CS and CC

On September 25, 2009, Spigarelli, Hegeman, Threats, and Dean of Students Tim Elstad

("Elstad") attended child abuse training.  (ECF No. 277-37.)

On October 7, 2009, Spigarelli completed an Incident Report following a report by a

visually impaired dorm resident, CC, that at an unknown time during the previous school year,

CS had come into the bathroom while CC was sitting on the toilet and had fondled CC's penis.

(ECF No. 256-24, Student Incident Report 10/7/09.)  Spigarelli discussed this incident with his

supervisor (Hegeman).  (*See* ECF No. 256-24 at 1, Student Incident Report 10/7/09.)

---

[4] Plaintiffs assert that this incident occurred prior to Thanksgiving and Christmas 2009.  (ECF No. 290 ¶¶ 25, 48.)
(*See* ECF No. 256-18 at 1, El Paso Cty. DHS Trails Sys. Report; *see also* ECF No. 277-3 at 6, Threats Dep. 151:13-
25, 152:1-21.)  This assertion of fact relies upon impermissible hearsay and speculation.

Contrary to the School's Policy and training, Spigarelli did not complete a Critical Incident Report and did not report the incident[5] between CS and CC to El Paso County Department of Human Services.  (ECF No. 256-2 at 30-31, Hilty Dep. 53:8-25, 54:1-11; *compare* ECF No. 256-24, Student Incident Report 10/7/09.)

Dorm Supervisor Hegeman shared the "incident" with then Principal for the School, Louis Tutt ("Tutt").  (ECF No. 256-25 at 3-4, Tutt Dep. 73:1-13, 74:16-25, 75:1-23, 76:1-12.) The "incident" was also shared with Trapp.  (ECF No. 256-20 at 14-15, Trapp Dep. 82:10-25, 83:1-15.)  Hegeman made the decision not to call DHS regarding the sexual abuse between CS and CC.  (ECF No. 277-12 at 2, Spigarelli Dep. 157:14-18.)  Tutt did not report the sexual abuse between CS and CC.  (ECF No. 277-11 at 3-4, 9, Tutt Dep. 76:6-18, 77:14-25, 78:1-7, 97:3-25, 98:1-2, 96:4-12.)

Threats learned about the sexual abuse between CS and CC.  (ECF No. 277-3 at 13-14, Threats Dep. 191:1-8, 194:10-25, 195:1.)

Tutt, upon becoming aware of the incident between CC and CS, discussed increasing supervision of CS in the dorms.  (ECF No. 256-25 at 3-4, Tutt Dep. 73:5-8.)  Tutt, however, did not increase supervision of CS.  (ECF No. 277-11 at 6, Tutt Dep. 87:5-25, 88:1-16.)

Not until February 13, 2014, were CC's guardians informed about the sexual abuse. (ECF No. 277-35 at 1-2, Aff. J. Baumgartner ¶ 5; ECF No. 277-36 at 1-2, Aff. D. Baumgartner ¶ 5.)

---

[5] The Court has concerns with the parties' citation to the record (ECF No. 290 ¶ 28 (citing ECF No. 256-2 at 30-31, Hilty Dep. 53:8-25, 54:1-11)) which refers to "this incident."  There is no context for "this incident."  Rather "this incident" only makes sense in relation to the Court's viewing the Student Incident Report dated October 7, 2009 (ECF No. 256-24).  Throughout the parties' factual submissions are oblique references to "this" or "that" "incident" or to "exhibit" numbers which do not correspond to the exhibits submitted in support of or opposition to the summary judgment motion.  The parties' factual submissions have made the Court's review of the record exceedingly convoluted and cumbersome.  The Court implores the parties to practice with better clarity.

For 2009-2010, CSDB did not enact a safety plan for CS following the report that CS sexually abused CC.  (ECF No. 277-14 at 9, 19, Elstad Dep. 200:4-8.)  A safety plan is a formal written document used by the School directed to a specific student.  (ECF No. 277-14 at 19, Elstad Dep. 200:8-25.)  The School did not take disciplinary action against CS in response to his sexually abusing CC.  (*See generally* ECF No. 256-24, Student Incident Report 10/7/11.)

(3)     Between CS and JC

On November 19, 2009, Spigarelli completed an Incident Report after finding CS in JC's room.  (ECF No. 256-26, Student Incident Report 11/19/09.)  JC reported that CS asked JC if he wanted to go in his room and "lay on top of him."  (ECF No. 256-26, Student Incident Report 11/19/09.)  JC further reported that on November 12, 2009, CS had tried to touch JC on his genitals and JC told him "no."  (ECF No. 256-26, Student Incident Report 11/19/09.)

CS's mother was contacted and an attempt was made to contact JC's family.  (ECF No. 256-26, Student Incident Report 11/19/09.)

Dorm Supervisor Hegeman made Tutt aware of the incident between CS and JC.  (ECF No. 256-26, Student Incident Report 11/19/09; ECF No. 256-25 at 9, Tutt Dep. 109:9-25, 109:1-15.)  Trapp was also advised of the incident between CS and JC.  (ECF No. 256-26, Student Incident Report 11/19/09.)

Contrary to the School's Policy and training, the incident between CS and JC was not reported to El Paso County Department of Human Services.  (ECF No. 256-2 at 32-36, Hilty Dep. 61:3-16, 62:6-21, 63:7-25, 74:16-25, 65:1-22; ECF No. 256-9 at 13, Elstad Dep. 106:16-21; ECF No. 256-25 at 19-20, Tutt Dep. 114:17-25, pp. 115-116, 150:3-21, pp. 169-170.)  Elstad acknowledges that Spigarelli, Jessica Rawlins ("Rawlins"), and Hegeman violated CSDB's

Policy by not reporting CS's sexually abusing JC.  (ECF No. 277-14 at 11, Elstad. Dep. pp. 89-92[6]; *compare* ECF No. 256-26, Student Incident Report 11/19/09.)

In 2009-2010, the School did not enact a safety plan for CS following the November 2009 sexual abuse of JC.  (ECF No. 277-14 at 19, Elstad Dep. 200:4-15.)

(4)     Abuse Suffered by BPS

Between February and March 2010, BPS reported to his grandmother that he had been sexually abused by someone at the School but that he could not identify who touched him[7]. (ECF No. 256-4 at 3, 5-7, K. Stewart Dep. 78:1-6, pp. 80-82.)  BPS, who is visually impaired (ECF No. 290 ¶ 4), did not see the person who had touched him in the bathroom.  (ECF No. 256-4 at 11, K. Stewart Dep. 88:2-10.)  BPS and CS engaged in non-consensual oral sex[8].  (ECF No. 277-39 at 2-3, BPS Dep. 35:3-9, 37:1-4, 37:20-24, 38:1-4; ECF No. 256-4 at 23-24, K. Stewart Dep. 134:1-25, 135:1-7.)

In March 2010, the Stewarts contacted BPS's teacher, Jamie Lugo ("Lugo") and reported that someone had touched BPS in the bathroom.  (ECF No. 256-4 at 13, K. Stewart Dep. p. 90:1-22; ECF No. 256-27 at 13-16, J. Stewart pp. 68-72; ECF No. 256-28 at 3-4, Lugo Dep. pp. 45-

---

[6] Although Plaintiffs cite to pages 93-95 of Elstad's deposition (ECF No. 277-14), the Court is unable to find those pages attached to the exhibit referenced.

[7] In support of their motion for summary judgment, Defendants rely upon BPS's statement to his grandmother and to his mom that he had been "touched . . . on his behind."  (ECF No. 290 ¶ 33 (citing ECF No. 256-4 at 3-7, K. Stewart Dep. 78:1-6, 79:16-19, pp. 80-82).)  This is clearly hearsay if asserted for the truth of the matter.  Plaintiffs, in response, assert that BPS told his mother and grandmother that the attacker put his finger in BPS's anus.  (ECF No. 290 ¶ 33 (citing ECF No. 277-16 at 4, K. Stewart Dep. 86:1-25, 87:1-9).)  Again, this is clearly hearsay if asserted for the truth of the matter.  It is inconsequential to the Court's analysis whether BPS's statement was that he was "touched on the butt" or had a finger placed in his anus.  Rather, what is consequential is that BPS was touched in a sexually harassing manner which the parties do not dispute.

[8] The parties set forth that BPS suffered one instance of sexual abuse.  (ECF No. 290 ¶¶ 148-165.)  Any clarity as to whether BPS suffered from more than one instance of sexual harassment is obscured by the parties' failing to present evidence as to how BPS became aware of whom was his assailant.  (ECF No. 290 ¶ 148.)  Specifically, during his deposition, BPS was able to identify that he and CS engaged in oral sex.  (ECF No. 256-4 at 23-24, K. Stewart Dep. 134:1-25, 135:1-7; ECF No. 277-39 at 2-3, BPS Dep. 35:3-9, 37:1-4, 37:20-24, 38:1-4.)  But BPS, at the time of the incident at issue, was unable to identify who touched him on his behind or in his rectum.  (ECF No. 256-4 at 11, K. Stewart Dep. 88:2-10; ECF No. 256-25 at 21-23, Tutt Dep. pp. 201-203.)  To the Court, although not cited by the parties, it is clear that BPS gained after-acquired knowledge as to whom was his assailant in the bathroom.  (ECF No. 277-39 at 2-3, BPS Dep. 35:3-9, 37:1-4, 37:20-24, 38:1-4.)

46.)  Lugo advised the Stewarts to meet with Tutt.  (ECF No. 256-28 at 8, Lugo Dep. 50:8-17.)

The Stewarts, subsequently, met with Tutt.  (ECF No. 256-4 at 10, K. Stewart Dep. 85:3-21.)

The Stewarts reported to Tutt that BPS had been touched inappropriately[9].  (ECF No. 256-4 at

26, K. Stewart Dep. 257:11-19; ECF No. 277-16 at 4, K. Stewart Dep. 86:1-4.)  Tutt advised the

Stewarts that nothing could be done because BPS could not identify who had touched him in the

bathroom.  (ECF No. 256-4 at 11, K. Stewart Dep. 88:5-10.)  Tutt advised the Stewarts that he

would discuss with staff more closely supervising BPS's bathroom visits.  (ECF No. 256-25 at

25, Tutt Dep. 205:17-25.)

In March 2010, Lugo did not report the sexual abuse of BPS to DHS.  (ECF No. 277-21

at 3, Lugo Dep. 75:1-21.)

(5)     Between CS and NF

On March 4, 2010, dorm staff Susan Reed ("Reed") completed an Incident Report after

observing a student, NF, in CS's room, sitting with his knees spread apart and holding out his

waistband enough for CS to look at NF's "private area."  (ECF No. 256-29, Student Incident

Report 3/4/10.)

The details that are the subject of the March 4, 2010 incident report between CS and NF

were shared with Threats and Trapp.  (ECF No. 256-29, Student Incident Report 3/4/10.)

Subsequent to the sexual incident between CS and NF, Threats instructed other dorm

staff that students were to get permission to visit between the east and west wings of the Ritter

dormitory.  (ECF No. 256-15 at 16-17, Threats Dep. 161:13-25, 162:1-5.)

---

[9] The parties continuously reference "sexual assault."  Defendants argue that there was no "sexual assault."
Plaintiffs counter and argue that CS's actions constituted "sexual assault."  The parties' argument misses the forest
for the trees.  Rather, what is at issue is whether CS's actions constituted "sexual abuse" as defined by the School's
policy and whether CS's actions constituted "sexual harassment" as used in Title IX.  Defendants do not set forth
facts and argument demonstrating that CS's touching of Plaintiffs does not constitute sexual harassment as
prohibited by Title IX.  The Court does not get bogged down in the parties' semantic differences of opinion.

(6)    CS's Confession

On May 5, 2011, CS admitted to Hall that he had sexual contact, including oral sex in some instances, with five students:  TN, CC, BPS, NF, and MAP.  (ECF No. 256-32 at 1-2, Student Incident Report 5/8/11; ECF No. 277-7 at 5, Hall Dep. 155:9-25, 156:1-3.)  Hegeman reported CS's confession to Elstad.  (ECF No. 256-33, Critical Incident Report 5/9/11.)

On May 9, 2011, CS's confession to sexual contact with certain students was reported to El Paso County DHS.  (ECF No. 256-33, Critical Incident Report 5/9/11.)

Subsequent to CS's confessing to sexual contact with certain students, Superintendent Hilty drafted a report describing the events confessed to Hall by CS, recommended continuous monitoring of CS, and recommended interim Principal for the School Barbara Meese ("Meese") establish a safety plan specific to CS.[10]  (ECF No. 256-34, Superintendent Report.)

Subsequent to CS's confessing to sexual contact with certain students, the School allowed CS to participate in the School musical alongside his victims.  (ECF No. 277-16 at 7, K. Stewart Dep. 120:12-25, 121:1-25, 122:1-9.)

c.    *Other Dorm Staff Actions*

At some point, dorm staff performed bedroom checks every 8-15 minutes and varied the intervals.  (ECF No. 256-23, 5/18/11 Memo by Hegeman; ECF No. 256-15 at 10, Threats Dep. 147:8-25; ECF No. 256-9 at 2, Elstad Dep. 29:12-19, 30:1-20.)

Prior to a 2011 ski trip in which CS participated, Tutt instructed Spigarelli that CS required 24 hour supervision.  (ECF No. 256-25 at 14-17, Tutt Dep. pp. 142-145; ECF No. 256-14 at 6, Spigarelli Dep. p. 110.)

---

[10] Defendants set forth that Hilty "ordered continuous monitoring of CS and instructed interim Principal for the School . . . establish a safety plane specific to CS."  (ECF No. 290 ¶ 65.)  Plaintiffs do not dispute this asserted fact. (ECF No. 290 ¶ 65.)  The record cited, however, does not support Defendants' contention.

At some point, Threats roomed with CS during a "goalball" team field trip.  (ECF No. 256-13 at 12, Hall Dep. 97:1-23.)

Following CS's confession, CS was informed[11] to use staff bathrooms for the remainder of the school year.  (ECF No. 256-4 at 19, K. Stewart Dep. 118:1-21; ECF No. 256-28 at 20, Lugo Dep. pp. 139-140.)

### 4.    Investigation of and Responses to Sexual Abuse

 In March 2010, MAP's mother observed MAP's nephew's mouth on MAP's penis.  (ECF No. 256-5 at 3-4, Skinner Dep. 59:10-25, 60:1-5.)  MAP's mother reported this incident to therapist Dr. Sharla Marek who in turn contacted Pueblo County DHS.  (ECF No. 256-5 at 6-7, 12, Skinner Dep. pp. 62-63, 80:7-10.)  Pueblo County DHS investigated the incident.  (ECF No. 256-5 at 6-7, 12, Skinner Dep. pp. 62-63, 80:7-10.)  Pueblo County DHS referred the matter to El Paso County DHS for further investigation.  (ECF No. 256-18, El Paso Cty. DHS Trails Sys. Report.)

On March 30, 2010, El Paso County initiated an investigation at the School that included a site visit on April 6, 2010 and interviews of CS, JC, MAP, and Threats.  (ECF No. 256-18 at 3-4, El Paso Cty. DHS Trails Sys. Report pp. 3-4.)

On April 6, 2010[12], DHS (Colorado) interviewed CS who admitted to sexual contact with MAP.  (ECF No. 256-18 at 4, El Paso Cty. DHS Trails Sys. Report p. 4.)

---

[11] Defendants set forth that CS was "restricted" to using staff bathrooms.  (ECF No. 290 ¶ 66.)  Plaintiffs do not dispute this contention.  (ECF No. 290 ¶ 66.)  The record cited, however, does not support this contention.

[12] Defendants set forth that this interview occurred in September 2010 which Plaintiffs do not dispute.  (ECF No. 290 ¶ 51.)  Defendants rely upon a document that is not authenticated nor are there any indicia that it is an official document.  (ECF No. 290 ¶ 51 (citing ECF No. 256-31 at 2, Elstad Timeline at 2).)  Therefore, because the contents of the document are currently inadmissible, the Court construes the record favorably for Plaintiffs and relies upon the DHS's report which identifies an interview date of April 6, 2010.

On November 24, 2010, DHS released a report detailing its investigation of CSDB and found that the complaints of neglect and lack of supervision were unfounded.  (ECF No. 256-18 at 3-5, El Paso Cty. DHS Trails Sys. Report pp. 3-5.)

On May 20, 2011, Superintendent Hilty sent a letter to parents providing information about CS's confession to sexual contact.  (ECF No. 256-2 at 47-50, Hilty Dep. pp. 97-100; ECF No. 256-37, Letter from Hilty to Parents 5/20/11.)

As a result of the sexual contact incidents, Superintendent Hilty commenced an investigation and spoke with relevant staff.  (ECF No. 256-2 at 26-27, Hilty Dep. 49:14-25; ECF No. 256-38, Hilty Handwritten Notes.)  Subsequently, Superintendent Hilty sent an e-mail to Elstad identifying certain deficiencies in staff-handling of the CS incidents and identifying areas for improvement.  (ECF No. 256-39, Hilty e-mail to Elstad 7/12/11.)  Elstad disciplined three[13] CSDB staff by issuing written corrective actions to Threats, Spigarelli, and Reed.  (ECF No. 256-40, Memo to Threats 6/24/11; ECF No. 256-41, Memo to Spigarelli; ECF No. 256-42, Memo to Reed.)

Following CS's confession, CSDB staff had meetings to determine whether CS could return to CSDB the following school year.  (ECF No. 256-1 at 3-4, Vigne Dep. pp. 28-30.)  CSDB staff, in conjunction with VS, determined that CSDB staff could not ensure the safety of other students if CS returned to CSDB and thus, CS returned to his home school district.  (ECF No. 256-1 at 3-4, Vigne Dep. pp. 29-30; ECF No. 256-44, Notice of Special Educ. Action.)  Following CS's confession, child abuse training was increased and is now offered on a monthly basis to all new staff.  (ECF No. 256-10 at 3, CSDB Resp. to First Set of Interrog. No. 2(a); ECF No. 256-11 at 3-4, CSDB Supp. Resp. to First Set of Interrog. No. 2(a).)

[13] Although Plaintiffs do not dispute the matter, Elstad did not issue discipline to Hegeman; rather, had Hegeman not resigned it is likely that Elstad would have made the decision to administer corrective and/or disciplinary action. (ECF No. 256-43, Letter to Hegeman 7/15/11.)

5.     Effects on BPS and MAP[14]

a.     *MAP*

Subsequent to CS's sexually abusing MAP, the School transferred MAP to a different

classroom.  (ECF No. 277-2 at 13, Skinner Dep. 181:17-25.)

From September through November 2009, during the time period MAP shared a dorm

suite with CS, the School caught MAP masturbating or inappropriately touching himself multiple

times.  (*See* ECF No. 277-47 at 1-6, PBS Referral Forms.)

In 2011, MAP's activities were restricted by the school:  he could not go to the bathroom

without being escorted and he could not attend certain school activities.  (ECF No. 277-2 at 13-

14, Skinner Dep. 179:4-13, 192:20-25, 193:1-6.)

b.     *BPS*

The year after CS confessed, BPS's parents transferred him to another school.  (ECF No.

277-17 at 3, K. Stewart Aff. ¶ 13.)

**B.     Procedural Background**

On December 11, 2014, the Court consolidated matters 12-CV-02664-RM-KLM and 12-

CV-02666-RM-KLM pending in the District of Colorado.

The operative complaints in this matter are the Second Amended Complaints, as

modified by the Magistrate Judge's recommendations and the Court's subsequent adoption of the

Magistrate Judge's recommendations.  (ECF Nos. 182; 243; 245; 293; 300; 301.)  Due to

confusion caused by the Court's order adopting the Magistrate Judge's recommendations, on

---

[14] Most of Plaintiffs' statements of fact (ECF No. 290 ¶¶ 191-228) in support of the proposition that the sexual
assaults had an effect on BPS and MAP do not address the material issue:  whether MAP and BPS were effectively
denied educational opportunities as a result of Defendants' allegedly violating Title IX.  Rather, Plaintiffs set forth
many facts that address the effect on MAP and BPS divorced from their educational opportunities.  (*See* ECF No.
290 ¶¶ 191-228.)  Further, many of Plaintiffs' statements of fact with respect to the effects on BPS and MAP are
based on opinion, speculation, and hearsay which are insufficient to create a disputed material fact.  (*See* ECF No.
290 ¶¶ 191-192, 194, 197, 200-207, 209-213, 215-228.)  The affidavit submitted in support of these statements of
fact (ECF No. 277-17) is not based on knowledge in large part; rather, it is based upon opinion.

August 20, 2015, the Court accepted as filed Plaintiffs' proposed second amended complaints. (ECF Nos. 293; 302.)  The Court ordered Defendants to file respective answers to the second amended complaints as allowed by the Court's prior order.  (ECF Nos. 293; 302.)

In moving for summary judgment, the parties treated the Second Amended Complaints as operative.  (*See* ECF Nos. 254; 281; 289; 290.)  The parties rely upon certain allegations in the Second Amended Complaints as operative facts which, at times, are undisputed.  The Court construes this failure to dispute an asserted fact as an admission as to a particular allegation set forth in the Second Amended Complaints.

## II.    LEGAL STANDARDS

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem. Coal Co., Inc.,* 41 F.3d 567, 569-70 (10th Cir. 1994).  "A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion . . . ."  *Robertson v. Bd. of Cty. Comm'rs of the Cty. of Morgan*, 78 F. Supp. 2d 1142, 1146 (D. Colo. 1999) (citation omitted).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one–sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000).  Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the burden then shifts to the non-moving party to move beyond the pleadings and to designate evidence which demonstrates the existence of a genuine dispute of material fact to be resolved at trial.  *See 1-800-Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted).  A fact is

"material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson*, 477 U.S. at 248. In considering whether summary judgment is appropriate, the facts must be considered in a light most favorable to the non-moving party. *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013) (citations omitted).

If a movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in its complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact") (citation omitted).

The content of evidence must be admissible to be considered when ruling on a motion for summary judgment. *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) (citation omitted) (holding that hearsay evidence is not acceptable in opposing a summary judgment motion); *Adams v. Am. Guarantee & Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citation omitted); *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). Affidavits must be based on personal knowledge and must set forth facts that would be admissible evidence at trial. *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quotations and citation omitted). "Conclusory and self-serving affidavits are not sufficient." *Id*. (citation omitted). The Court will not consider statements of fact, or rebuttals thereto, which are not material or are not supported by competent evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(e)(2), 56(e)(3). "[O]n a motion for summary judgment, it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to

conduct its own search of the record." *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (internal quotation and citation omitted).  The Court is "not obligated to comb the record in order to make [Plaintiffs'] arguments for [them]."  *See Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000).  Further, Local Rule 7.1(e) provides that "[e]very citation in a motion, response or reply shall include the specific page or statutory subsection to which reference is made."  D.C. Colo. L. Civ. R. 7.1(e).

"In order to survive summary judgment, the content of the evidence that the nonmoving party points to must be *admissible*."  *Adams*, 233 F.3d at 1246 (alteration in original and citation omitted).  "The nonmoving party does not have to produce evidence in a form that would be admissible at trial, but "'the content or substance of the evidence must be admissible.'"  *Id*.  "Evidence presented must be based on more than 'mere speculation, conjecture, or surmise' to defeat a motion for summary judgment."  *Southway v. Cent. Bank of Nigeria*, 149 F. Supp. 2d 1268, 1274 (D. Colo. 2001) (citations omitted).  "Rule 56 expressly prescribes that a summary judgment affidavit must 'be made on personal knowledge, set forth facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.'"  *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010) (citation omitted); *accord* Fed. R. Civ. P. 56(c)(4).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . ., the court may:  (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order."  Fed. R. Civ. P. 56(e).

III.    **ANALYSIS**

A.      **Title IX Claims**

In *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629, 633

(1999), the Supreme Court held that Section 1681 of Title IX creates a private cause of action for

student-on-student sexual harassment[15].  A Title IX funding recipient is liable for student-on-

student harassment if it is "deliberately indifferent to sexual harassment, of which [it] has actual

knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive

the victims of access to the educational opportunities or benefits provided by the school."  *Id*. at

650.  The standard for student-on-student sexual harassment claims is far more rigorous than a

claim for teacher-on-student harassment.  *See id*. at 650-53.

Student-on-student sexual harassment rises to the level of actionable Title IX

discrimination only if the harassment is "sufficiently severe."  *Id*. at 650.  The plaintiff must

establish not only that the Title IX funding recipient was deliberately indifferent to known acts of

harassment, but also that the known harassment was "so severe, pervasive, *and* objectively

offensive that it denie[d] its victims the equal access to education that Title IX is designed to

protect."[16]  *Id*. at 652 (emphasis added).

---

[15] Harassment on the basis of sex can be perpetrated by an individual of the same sex as the victim for Title VII purposes, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998), and the same reasoning applies in the Title IX context.

[16] Title IX's standard is different from that applicable in Title VII cases in which a hostile work environment claim exists when, in pertinent part, the harassment a victim suffers from is "sufficiently severe *or* pervasive to alter a term, condition, or privilege of the victim's employment and create an abusive working environment."  *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012) (citation omitted and emphasis added).  That is, Title IX focuses on a conjunctive analysis while Title VII focuses on a disjunctive analysis.  The Court notes, however, that several courts have found one incident of peer-to-peer sexual harassment sufficient to establish potential liability for a federal funding recipient.  *See Willliams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1298 (11th Cir. 2007) (harassment "involved a ringleader who lured the victim to his territory and then conspired with two friends to commit two separate acts of sexual assault and so constitutes a continuous series of events […] [a]lthough occurring in one room over two hours, the acts are sufficient to meet the requirements of severity and objective offensiveness"); *see Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000) (noting that "one incident can satisfy a claim"); *see also Carabello v. New York City Dep't of Educ.*, 928 F. Supp. 2d 627, 643

The Supreme Court imposed this high standard to guard against the imposition of "sweeping liability." *Id*. at 652. Unlike an adult workplace, children "may regularly interact in a manner that would be unacceptable among adults." *Id*. at 651. Children, due to their immaturity, will invariably engage in some forms of teasing, shoving, and name-calling that "target differences in gender." *Id*. at 651-52. "Some risk of sexual harassment is inherent to the enterprise of public education, in particular, because public schools must educate even the most troublesome and defiant students." *Hill v. Cundiff*, -- F.3d --, 2015 WL 4747048, at *14 (11th Cir. Aug. 12, 2015).

> A federal funding recipient
>
> may be liable under Title IX provided it (1) has actual knowledge of, and (2) is deliberately indifferent to, (3) harassment that is so severe, pervasive and objectively offensive as to (4) deprive access to the educational benefits or opportunities provided by the [entity].

*Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008) (citing *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1246 (10th Cir. 1999)).

Applying this test, the Court concludes disputed material facts exist as to whether Defendants had actual knowledge that CS's behavior constituted sexual harassment so severe, pervasive, and objectively offensive as to deprive MAP and BPS of educational opportunities.

### 1.     Whether Defendants are Title IX Funding Recipients

As a threshold matter, the Court must determine whether Defendants are subject to Title IX based upon the receipt of federal funds. *See Davis*, 526 U.S. at 650.

---

(E.D.N.Y. 2013) (identifying and collecting cases). The Court follows the directive from *Davis* and analyzes whether the incidents were severe, pervasive, *and* objectively offensive.

a.      *The School*

The parties do not dispute that the School is a federal funding recipient.  Therefore, Plaintiffs succeed on this threshold question as to the School.  (ECF No. 256-3 at 2, Hilty Aff. ¶ 8.)

b.      *The Board*

Defendants argue that the Board is not a recipient of federal financial assistance.  (ECF No. 254 at 10 n.3.)  Defendants, in support of this argument, rely upon Superintendent Hilty's affidavit.  (ECF No. 290 ¶ 3 (citing ECF No. 256-3 at 2, Hilty Aff. ¶ 8).)  Defendants' reliance upon Hilty's affidavit is insufficient as her affidavit does not set forth facts demonstrating how she has personal knowledge as to whether the Board receives federal funds (*see generally* ECF No. 256-3, Hilty Aff).  *See Johnson*, 594 F.3d at 1210.  Therefore, there exists a disputed material fact as to whether the Board *actually*[17] receives federal financial assistance.  Thus, based on the record before the Court, Plaintiffs succeed on this threshold question as to the Board.[18]

2.      Whether Defendants Had Actual Knowledge of the Sexual Harassment Discrimination Plaintiffs Faced

The first element requires an "appropriate person" capable of putting Defendants on notice had "actual knowledge" of CS's sexually harassing Plaintiffs.  *Rost*, 511 F.3d at 1119.  The Court begins by identifying whether "appropriate persons" capable of putting Defendants on notice of CS's sexual harassment exist.  The Court then discusses whether Defendants had actual knowledge of CS's sexual harassment.

---

[17] The Board is statutorily authorized to apply for and receive federal funds.  Colo. Rev. Stat. § 22-80-103(4)(d).

[18] The Court, in a separate order to follow, will provide instructions to the parties as to additional briefing on this aspect of Plaintiffs' claims.

a.    *Appropriate Persons*

The Supreme Court has explained that an "appropriate person" is an official of the recipient entity who "at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf."  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

The parties do not address and therefore appear to agree (*see generally* ECF Nos. 254; 281; 289) that "appropriate persons" at respective Defendants[19] had authority to address the alleged discrimination and to institute corrective measures.  The Court agrees.  (ECF No. 256-15 at 11-15, Threats Dep. 150:18-25, pp. 151-54[20]; ECF No. 256-35, E-mail from C. Hilty to Board 5/18/11.)

b.    *Actual Knowledge*

In *Gebser*, the Supreme Court explained that to make a Title IX claim against a federal funding recipient for sexual harassment, the plaintiff must show an appropriate person had "actual knowledge of *discrimination in the recipient's programs*. . . ."  524 U.S. at 290 (emphasis added).  The Tenth Circuit has held that the Supreme Court "implicitly decided that harassment of persons other than the plaintiff may provide the school with the requisite notice to impose liability under Title IX."  *Escue v. N. Ok. Coll.*, 450 F.3d 1146, 1153 (10th Cir. 2006) (citing *Gebser*, 524 U.S. at 290).  The "actual notice standard does not set the bar so high that a [federal funding recipient] is not put on notice until it receives a clearly credible report of sexual

---

[19] In moving for summary judgment, Defendants aver that "[t]he Board was informed for the first time of the CS incidents via an e-mail sent by Carol Hilty to Board members on May 18, 2011."  (ECF No. 290 ¶ 67 (citing ECF No. 256-35, C. Hilty e-mail to Board 5/18/11).)  Plaintiffs, in part, dispute this fact.  (ECF No. 290 ¶ 67.)  Plaintiffs dispute this averment to the extent that the e-mail does not establish that the Board *first* learned of CS's actions.  Plaintiffs do not dispute this fact to the extent that it establishes that the Board had actual knowledge.  The e-mail (ECF No. 256-35, C. Hilty e-mail to Board 5/18/11) does not establish that it was sent to the Board because individual recipients of the e-mail are not identified as Board members within the e-mail itself.  But because the parties do not dispute that the e-mail was sent to Board members, the Court construes the recipients as including Board members.
[20] Threats had authority to reassign students to different rooms.

abuse from the plaintiff-student." *Escue*, 450 F.3d at 1154 (internal quotation and citation

omitted).  Rather, the Tenth Circuit has held that a federal funding recipient has actual

knowledge of a substantial risk of abuse to students based on prior complaints by other students.

*Id*. (citation omitted).

### (1)     The School

The parties do not address and therefore appear to agree (*see generally* ECF Nos. 254;

281; 289) that the School had actual knowledge of CS's sexually harassing[21] Plaintiffs.  The

Court agrees.  (ECF No. 277-5 at 2, MAP Dep. 30:21-23; ECF No. 256-4 at 13, K. Stewart Dep.

p. 90:1-22; ECF No. 256-27 at 13-16, J. Stewart pp. 68-72; ECF No. 256-28 at 3-4, Lugo Dep.

pp. 45-46; ECF No. 256-4 at 26, K. Stewart Dep. 257:11-19; ECF No. 277-16 at 4, K. Stewart

Dep. 86:1-4.)

### (2)     The Board

Defendants argue that "Plaintiffs cannot set forth any evidence demonstrating . . . 'actual

knowledge' on behalf of the Board of the CS incidents until after CS confessed in 2011. . . ."

(ECF No. 254 at 10 n.3.)  The Board was informed of CS's sexual contact with other School

students via an e-mail sent by Hilty to Board members on May 18, 2011.  (ECF No. 256-35, E-

mail from C. Hilty to Board 5/18/11.)  Defendants fail to provide the Court with admissible

evidence that the Board *did not* have knowledge of CS's sexually abusing other students at the

School prior to May 18, 2011.  (*See generally* Dkt.)  Despite Defendants' argument to the

contrary, the referenced e-mail does not identify that this is how the Board *first* became of CS's

sexually abusing other students.  It is Defendants' burden, as the movant, to establish the absence

---

[21] Again, Defendants argue that it was not until CS's confession and the subsequent police investigation that the
School learned that CS had perpetrated "sexual assaults."  (ECF No. 254 at 19-23.)  That is not the issue.  Rather,
the relevant inquiry is whether Defendants had actual knowledge of sexual *discrimination or harassment*.  *See
Davis*, 526 U.S. at 650.  And as to this issue, there is no factual dispute that the School had actual knowledge of
sexual discrimination or harassment when Threats witnessed the sexual harassment between CS and MAP in the
bathroom and when BPS's parents reported to Lugo and Tutt the incident concerning their son.

of a disputed material fact.  *See 1-800-Contacts, Inc.,* 722 F.3d at 1242.  Defendants have failed

to carry their burden with respect to when the Board first had actual knowledge of CS's sexually

harassing behavior.  The Court acknowledges that a summary judgment movant need not negate

a non-movant's claim but, rather, merely point to an absence of evidence supporting it.  *Celotex*

*Corp.*, 477 U.S. at 325.  But a disputed material fact exists as to when the Board became aware

of CS's sexually harassing students at the School and therefore, the Board is not entitled to

summary judgment with respect to the first element.

> 3.    Was the Sexual Harassment and Discrimination Plaintiffs Faced, of Which
>       Defendants Had Knowledge, Severe, Pervasive, and Objectively
>       Offensive[22]

As to the second element, the Court considers whether the sexual harassment and

discrimination, of which Defendants had actual knowledge, was sufficiently "severe, pervasive,

and objectively offensive."  *Davis*, 526 U.S. at 651.  "Whether gender-oriented conduct rises to

the level of actionable [Title IX] harassment . . . depends on a constellation of surrounding

circumstances, expectations, and relationships, including, but not limited to, the ages of the

harasser and the victim and the number of individuals involved."  *Id.* (quotations and citations

omitted).  To be severe, pervasive, and objectively offensive, the behavior must be serious

enough to have a "systemic effect" of denying equal access to an education.  *Davis*, 526 U.S. at

652.  A "single instance of sufficiently severe one-on-one peer harassment" is unlikely to have

such a systemic effect in light of "the amount of litigation that would be invited by entertaining

claims of official indifference to a single instance of one-on-one peer harassment."  *Id.* at 652-53.

Defendants argue "a reasonable jury [could not] conclude that the single instance of peer-

to-peer harassment of BPS and the incidents between CS and MAP, were so severe, pervasive,

---

[22] Despite the Tenth Circuit Court of Appeal's outline for considering a Title IX claim, *Rost*, 511 F.3d at 1119, the Court considers this element of a Title IX claim prior to determining whether Defendants were deliberately indifferent to the alleged sexual harassment and discrimination.

and objectively offensive that the School deprived BPS and MAP of access to the educational opportunities of benefits provided by the School." (ECF No. 254 at 26.)  Defendants do not distinguish between the elements of the alleged statutory violation:  first, whether the incidents were "so severe, pervasive, and objectively offensive" and second, whether Defendants' response (or lack thereof) effectively barred Plaintiffs' access to an educational opportunity or benefit. (*See generally* ECF No. 254.)  Regardless, the Court finds that a disputed material fact exists as to whether CS's sexual harassment and discrimination of Plaintiffs (and other students), of which Defendants had actual knowledge was sufficiently severe, pervasive, and objectively offensive.

With respect to MAP, an unspecified number of sexual abuse incidents occurred between CS and MAP.  (ECF No. 277-5 at 2, MAP Dep. 30:12-19, 31:4-6; ECF No. 256-18 at 2-3, El Paso Cty. DHS Trails Sys. Report 3/30/10 pp. 2-3; ECF No. 256-5 at 8-11, Skinner Dep. pp. 64-67.)  Further, MAP has cognitive impairments (ECF No. 290 ¶ 5) which a reasonable jury could find made him susceptible to sexual abuse.  With respect to BPS, during the alleged sexual abuse, CS appears to be between three to five years older than BPS.  (*See* ECF No. 256-4 at 2, K. Stewart Dep. 60:15-21; ECF No. 290 ¶ 4 (identifying that BPS enrolled in CSDB in 2005 at the age of 5) and *compare with* ECF No. 290 ¶ 15 (identifying that CS enrolled in CSDB in 2008 at approximately age 12).)  A reasonable jury could find the age difference between BPS and CS made BPS susceptible to sexual abuse.

A reasonable jury could find the harassment was severe, pervasive, and objectively offensive.  Specifically, the sexual abuse suffered by BPS and MAP coupled with Defendants' failure to take action other than to document the incidents, *see infra* Analysis.A.4, could be viewed as creating a severe *and* pervasive environment that is objectively offensive.  In *Simpson*

*v. University of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007), the Tenth Circuit Court of

Appeals addressed a situation that is analogous to the present matter where the "central question

in [that] case [was] whether the risk of [the] assault[s] [at issue] during recruiting visits was

obvious." *Id*. at 1180-81.  In *Simpson*, the Tenth Circuit held that (1) the federal-funding

recipient ("CU") had "general knowledge of the serious risk of sexual harassment and assault

during college-football recruiting efforts"; (2) CU knew that "such assaults had indeed occurred

during CU recruiting visits"; (3) CU nevertheless maintained an "unsupervised player-host

program to show high-school recruits a 'good time'"; and (4) CU "knew, both because of

incidents reported to [it] and because [its] own unsupportive attitude, that there had been no

change in atmosphere since 1997 (when [a] prior assault occurred) that would make such

misconduct less likely in 2001" when the at issue assaults occurred.  *Id*. at 1184.  Therefore, the

Tenth Circuit found that a "jury could infer that 'the need for more or different training [of

player-hosts was] so obvious, and the inadequacy so likely to result in [Title IX violations], that

[[CU] could] reasonably be said to have been deliberately indifferent to the need."  *Id*. at 1184-

85 (alterations in original and citation omitted).  Further, the Tenth Circuit found that the federal

funding "recipient can be said to have intentionally acted in clear violation of Title IX, when the

violation is caused by official policy, which may be a policy of deliberate indifference to

providing adequate training or guidance that is obviously necessary for implementation of a

specific program or policy of the recipient."  *Id*. at 1178 (internal quotation and citation omitted).

Analogously, in this matter, a reasonable jury could find that Defendants (1) had general

knowledge that CS was engaging in sexually harassing behavior, *see supra* Analysis.A.2; (2)

knew that such assaults had indeed occurred during CS's enrollment in the School, *see supra*

Analysis.A.2; (3) nevertheless did not change its response to CS's sexually harassing behavior,

*see infra* Analysis.A.4; and (4) did not respond to CS's sexually harassing behavior in an

effectual manner, *see infra* Analysis.A.4, which made Plaintiffs more vulnerable to such

conduct, *see infra* Analysis.A.4.

Therefore, although the Court has concerns with whether the single-instance of sexual

abuse suffered by BPS constitutes a severe *and* pervasive environment of objectively offensive

conduct, the Tenth Circuit's decision in *Simpson* provides a basis on which a reasonable jury can

find a severe, pervasive, and objectively offensive environment when it couples Defendants'

arguable pervasive deliberate indifference and the severity of the abuse.

A reasonable jury could conclude that the multiple instances of sexual abuse suffered by

MAP constitute an independent severe, pervasive, and objectively offensive environment in

addition to the coupling of Defendants' arguable passive deliberate indifference and the severity

of the abuse.

> 4.   Were Defendants Deliberately Indifferent to the Sexual Harassment
>       and Discrimination Plaintiffs Faced

As to the third element, federal funding recipients are deliberately indifferent "only

where the recipient's response to the harassment or lack thereof is clearly unreasonable in light

of the known circumstances." *Davis*, 526 U.S. at 648.  A clearly unreasonable response causes

students to undergo harassment *or makes them more vulnerable to it*.  *Davis*, 526 U.S. at 645

(citation omitted).  The "standard is not that [federal funding recipients] must 'remedy' peer

harassment, but that they 'must merely respond to known peer harassment in a manner that is not

clearly unreasonable.'"  *Rost*, 511 F.3d at 1123 (citation omitted).  The deliberate indifference

standard "does not mean that recipients can avoid liability only by purging their schools of

actionable peer harassment or that administrators must engage in particular disciplinary action."

*Davis*, 526 U.S. at 648.  The standard does not mean that recipients must expel every student

accused of misconduct. *See id*. Victims do not have a right to particular remedial demands and courts should not second guess the disciplinary decisions that school administrators make. *See id*. (citation omitted). At this point, the parties' differences become more apparent.

Defendants argue that its responses to the known circumstances involving CS, including both before[23] and subsequent to his enrollment, were not clearly unreasonable. (ECF No. 254 at 6-23.) Defendants rely upon "confusion" or "uncertainty" among CSDB staff with respect to the School's Policy governing the reporting of sexual abuse. (ECF No. 254 at 7.) Plaintiffs argue that Defendants' responses were clearly unreasonable. (ECF No. 281 at 9-10, 11-17.) The Court finds a reasonable jury could return a verdict for Plaintiffs as to whether Defendants' responses to CS's sexual harassment were deliberately indifferent.

In October 2009, the School became aware that CS sexually abused CC. Appropriate persons, including Hegeman, Tutt, Trapp, and Threats, who have/had the ability to take remedial measures were aware of CS's sexual abuse of CC. Although the staff had been trained, CSDB employees failed to (1) report the sexual abuse to appropriate outside entities; (2) use a Critical Incident Report to document the sexual abuse; and (3) inform CC's guardians of the sexual abuse. At this point, Trapp had been made aware of VS's concerns regarding CS's sexual activities prior to enrolling in the School. Tutt, upon becoming aware of the incident between CC and CS, discussed increasing supervision of CS in the dorms but the record does not reveal an increase in supervision of CS. A reasonable jury could find Defendants' response (or lack thereof) to CS's sexually abusing CC clearly unreasonable because no actions, other than to document the incident on the incorrect form, were taken to prevent further[24] sexual abuse of

---

[23] The Court previously noted that "actual knowledge" can only arise when the harassment took place in the federal funding recipient's programs. *See supra*, Analysis.A.2.b.

[24] At this point, Defendants' failure to establish when CS sexually abused MAP becomes fatal to its argument that it was not deliberately indifferent. Because of the absence of facts establishing when CS sexually abused MAP, the

other students, including BPS and MAP.  That is a reasonable jury could find Defendants' lack

of response to CS's sexually abusing CC made BPS and MAP more vulnerable to sexual

harassment because no actions were taken to prevent CS from engaging in such activities in the

future and no third-party entity was notified that could investigate the matter.

In November 2009, the School became aware that CS sexually abused JC.  Appropriate

persons, including Hegeman, Tutt, and Trap, who have/had the ability to take remedial measures

were aware of CS's sexual abuse of JC.  Although the staff had been trained, CSDB employees

failed to (1) report the sexual abuse to appropriate outside entities; and (2) use a Critical Incident

Report to document the sexual abuse.  Again, at this point, Trapp had been made aware of VS's

concerns regarding CS's sexual activities prior to enrolling in the School.  In 2009-2010, the

School did not enact a safety plan for CS in response to his sexually abusing JC.  A reasonable

jury could find Defendants' response (or lack thereof) to CS's sexually abusing JC clearly

unreasonable because no actions other than to document the incident on the incorrect form were

taken to prevent further[25] sexual abuse of other students, including BPS and MAP.  That is a

reasonable jury could find Defendants' lack of response to CS's sexually abusing CC made BPS

and MAP more vulnerable to sexual harassment because no actions were taken to prevent CS

from engaging in such activities in the future and no third-party entity was notified that could

investigate the matter.

An incident in which CS sexually abused MAP by attempting to remove his pants in the

bathroom was witnessed by Threats.  Although Threats had been trained on sexual abuse

reporting requirements, he failed to (1) report the sexual abuse to appropriate outside entities;

---

Court construes the absence of that fact in a light most favorable to Plaintiffs.  Thus, the Court construes the record
to reflect that Defendants had knowledge of CS's sexually abusing CC prior to CS's sexually abusing MAP.

[25] At this point, Defendants' failure to establish when CS sexually abused MAP becomes fatal to its argument that it
was not deliberately indifferent.  Because of the absence of facts establishing when CS sexually abused MAP, the
Court construes the absence of that fact in a light most favorable to Plaintiffs.  Thus, the Court construes the record
to reflect that Defendants had knowledge of CS's sexually abusing JC prior to CS's sexually abusing MAP.

and (2) use a Critical Incident Report to document the sexual abuse.  A reasonable jury could find Defendants' response (or lack thereof) to CS's sexually abusing MAP clearly unreasonable because the only actions taken, and it is unclear whether this occurred prior to or after the incident being discussed, to prevent additional sexual abuse of MAP was to move MAP to a different dormitory room.  But this did not inhibit MAP and CS from interacting.

An incident in which BPS was sexually abused by being inappropriately touched while in the bathroom was reported to Lugo and Tutt.  Although Lugo and Tutt had been trained on sexual abuse reporting requirements, they failed to (1) report the sexual abuse to appropriate outside entities; and (2) use a Critical Incident Report to document the sexual abuse.  A reasonable jury could find Defendants' response (or lack thereof) to the sexual abuse suffered by BPS clearly unreasonable because no actions were taken to prevent further sexual abuse of other students, including BPS and MAP.

A reasonable jury could find the facts of this matter similar to the facts where a federal funding recipient learned of a problem and did nothing.  *See Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000) (school district only spoke to the supposed perpetrators after a female student was intentionally and repeatedly sexually harassed); *see also Murrell v*, 186 F.3d at 1243-44 (teachers did not inform the plaintiff's parent of sexual assaults on plaintiff at school and did not inform law enforcement, investigate, or discipline the offending student).  Certainly a "minimalist response is not within the contemplation of a reasonable response." *Escue*, 450 F.3d at 1155 (citing *Vance*, 231 F.3d at 260).

> Where a [federal funding recipient] has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior.  Where a [federal funding recipient] has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such [federal funding recipient] has failed to act reasonable in light of the known circumstances.

*Vance*, 231 F.3d at 261.

For approximately two years (from the first report of student-on-student sexual harassment in October 2009 till Defendants reported CS's sexual-abuse confessions to DHS in May 2011), the only actions Defendants took in an attempt to remedy CS's sexually abusive behavior involved merely documenting the incidents and moving MAP to a different room. Defendants informed CS to use staff bathrooms but the record does not reflect that they restricted his use only to those bathrooms. Defendants discussed increasing supervision of CS but the record does not reflect that they actually increased supervision of him. Defendants did not increase training immediately as a result of the supposed "confusion" surrounding CS's sexually abusing other students. Defendants did not report to DHS CS's sexually abusing any student until May 2011, approximately two years after it first learned of potential sexual abuse. Despite actual knowledge that CS was repeatedly engaging in peer-to-peer sexual harassment, Defendants did not alter their known to be ineffective tactics in responding the sexual harassment for approximately two years. The Court finds a factual dispute exists as to whether Defendants' actions were clearly unreasonable in response to CS's sexually abusing MAP and BPS. The Court is not second-guessing Defendants' operational decisions, rather it is finding that a reasonable jury could find Defendants were deliberately indifferent to known circumstances that made MAP and BPS more vulnerable to CS's sexually harassing them.

Despite Defendants' argument (ECF No. 254 at 9), it is inconsequential to the Court's analysis that El Paso County DHS investigated the conditions and supervision in the CSDB dormitory and determined that the report of "institutional neglect" and "lack of supervision" were "unfounded." Rather, the issue for the Court is whether a reasonable jury could find

Defendants' responses (or lack thereof) to the known incidents of sexual abuse were deliberately indifferent.

> 5. <u>Did Defendants' Deliberate Indifference to the Harassment and Discrimination Effectively Bar Plaintiffs' Access to an Educational Opportunity or Benefit</u>

As to the fourth element, federal funding recipients are liable when their deliberate indifference to sexual harassment has a "systemic effect" of denying equal access to an education. *Davis*, 526 U.S. at 652. That is, Defendants' deliberate indifference must have had a "concrete, negative effect" on Plaintiffs' ability to receive an education. *Davis*, 526 U.S. at 654. Examples of a negative impact include dropping grades, *Davis*, 526 U.S. at 634, and having to leave school to be hospitalized, *Murrell*, 186 F.3d at 1248. Similar to the third element, at this point, the parties' differences become more apparent.

With respect to MAP, subsequent to CS's sexually harassing him and Defendants' arguable deliberate indifference, the School transferred MAP to a different classroom. Further, in 2011, the School restricted MAP's activities: he could not go to the bathroom without being escorted and he could not attend certain school activities. Drawing all reasonable inferences in favor of MAP, a jury could find CS's sexual harassment of MAP combined with Defendants' deliberate indifference had a concrete, negative effect on his ability to receive an education. *See Davis*, 526 U.S. at 654.

With respect to BPS, subsequent to his suffering sexual abuse and Defendants' arguable deliberate indifference, BPS's parents transferred him to another school[26]. Drawing all

---

[26] BPS transferred to another school a year after CS confessed to sexually abusing BPS. (ECF No. 277-17 at 3, K. Stewart Aff. ¶ 13.) Defendants assert that BPS remained enrolled at CSDB for approximately two years. (ECF No. 290 ¶ 77 (citing ECF No. 256-4, K. Stewart Dep. 172:8-25, pp. 173-174).) First, Defendants' cited pages are not in the record. (*See generally* Dkt.) Second, the Court notes that an excessively long period in which a Title IX victim does not suffer from a concrete, negative impact, *i.e.*, having to transfer schools, may be sufficient to negate a causal inference that the sexual harassment was the cause of the Title IX victim's deprivation of equal access to educational resources. However, in this case, the affected children are impaired in one or more ways which may make their

reasonable inferences in favor of BPS, a jury could find BPS's suffering sexual harassment combined with Defendants' deliberate indifference had a concrete, negative effect on his ability to receive an education.  *See Davis*, 526 U.S. at 654.

## B.      ADA and Rehabilitation Act Claims[27]

Title II of the ADA provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  To survive summary judgment under Title II, the plaintiff must show a disputed material fact with respect to whether "(1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability."  *See Cohon ex rel. Bass v. New Mexico Dep't of Health*, 646 F.3d 717, 725 (10th Cir. 2011) (internal quotation and citation omitted).

Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or

---

ability to leave or transfer more complicated than for that of an "ordinary" student at an "ordinary" school.  In this matter, because of the School's function to provide educational opportunities for deaf and visually impaired students (ECF No. 256-2 at 2-3, Hilty Dep. 15:20-25, 16:1-16) and K. Stewart's testimony that another school may not be properly equipped to teach BPS (ECF No. 277-17 at 3, K. Stewart Aff. ¶ 14), the Court leaves the factual issue, *i.e.*, whether the harassment had a negative, concrete impact on BPS, with the jury.

[27] Defendants, in their reply brief, raise for the first time an argument that Plaintiffs lack standing to assert their claims that Defendants violated the ADA or Rehabilitation Act.  (ECF No. 289 at 27-28.)  While Defendants are correct that standing is an issue that can be raised at any time in the judicial process, *Bd. of Cty. Commissioners v. W.H.I., Inc.*, 992 F.2d 1061, 1063 (10th Cir. 1993) (citation omitted), it is not properly raised in a reply brief, *Pippin v. Burlington Resources Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006).  "When a party puts forth new arguments in a reply brief, a court may avoid error by either:  (1) choosing not to rely on the new arguments in determining the outcome of the motion; or (2) permitting the nonmoving party to file a surreply."  *E.E.O.C. v. Outback Steak House of Fla., Inc.*, 520 F. Supp. 2d 1250, 1260 (D. Colo. 2007) (citing *Pippin*, 440 F.3d at 1192).  Plaintiffs have not moved for leave to file a surreply and the Court has not prohibited them from filing one.  (*See generally* Dkt.)  But the Court avoids error by not relying on Defendants' new standing argument in addressing the sufficiency of Defendants' summary judgment motion.

33

activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To survive summary judgment under Section 504, "a plaintiff must [show a disputed material fact with respect to] (1) that he is a 'handicapped individual' under the [Rehabilitation] Act, (2) that he is 'otherwise qualified' for the [benefit] sought, (3) that he was [discriminated against] solely by reason of his handicap, and (4) that the program or activity in question receives federal financial assistance." *See Cohon*, 646 F.3d at 725 (internal quotation and citation omitted).

"To the extent feasible, [the Court] look[s] to decisions construing the Rehabilitation Act to assist [the Court] in interpreting analogous provisions of the ADA." *Cohon*, 646 F.3d at 725 (internal quotation and citation omitted) (collecting cases).

As a preliminary matter, the Court finds a disputed material fact as to whether the Board receives federal financial assistance. Defendants, in support of their argument that the Board does not receive federal financial assistance, rely upon Superintendent Hilty's affidavit. (ECF No. 290 ¶ 3 (citing ECF No. 256-3 at 2, Hilty Aff. ¶ 8).) Defendants' reliance upon Hilty's affidavit is insufficient as her affidavit does not set forth facts demonstrating how she has personal knowledge as to whether the Board receives federal funds (*see generally* ECF No. 256-3, Hilty Aff). *See Johnson*, 594 F.3d at 1210. Therefore, there exists a disputed material fact as to whether the Board *actually*[28] receives federal financial assistance.[29] Thus, based on the record before the Court, Plaintiffs succeed on this element as to their claims against the Board.

Because of the existence of a dispute as to whether the Board receives federal financial assistance, the Court proceeds to analyze simultaneously Plaintiffs' ADA and Rehabilitation Act claims as to both Defendants.

---

[28] The Board is statutorily authorized to apply for and receive funds. Colo. Rev. Stat. § 22-80-103(4)(d).

[29] The Court, in a separate order to follow, will provide instructions to the parties as to additional briefing on this aspect of Plaintiffs' claims.

Plaintiffs' argument that "[s]tudents at CSDB in general were treated less favorably than students in traditional schools because of the school's practice of failing to report sexual abuse" (ECF No. 281 at 29) is a non sequitur as to their disability claims. Rather, Plaintiffs must establish that they were discriminated against or treated less favorably by Defendants as a result of their disabilities.

With respect to BPS, BPS's parents informed Tutt that BPS had been sexually abused in the bathroom at some point between February and March 2010. Although Defendants argue that Tutt "was not aware of a reportable event of suspected abuse because BPS and parents did not report a *sexual assault*," (ECF No. 254 at 27) that is inconsequential to the analysis because the issue is whether they reported sexual abuse, *i.e.*, inappropriate touching, which is not disputed. Tutt in response to BPS's parents' informing him of the sexual abuse informed them that the School would not investigate the matter because BPS could not identify the perpetrator of the sexual abuse. Because BPS is visually impaired he did not see the perpetrator. Drawing all reasonable inferences in favor of Plaintiffs, a reasonable jury could conclude that Defendants refused to investigate the matter because of BPS's visual disability and that if BPS were not visually impaired, Defendants would have investigated the matter.

With respect to MAP, Plaintiffs fail to establish a disputed material fact as to Defendants' response (or lack thereof) that was linked to any of his disabilities. (*See generally* ECF Nos. 281; 290.)

Therefore, Defendants are entitled to summary judgment as to MAP's (and related Plaintiff) ADA and Rehabilitation Act claims. Defendants are not entitled to summary judgment as to BPS's (and related Plaintiffs) ADA and Rehabilitation Act claims.

C.      **Request for Punitive Damages**

Defendants argue that Plaintiffs are statutorily precluded from recovering punitive

damages under Title IX, the ADA, and the Rehabilitation Act.  (ECF No. 254 at 28-29.)

Plaintiffs do not respond to Defendants' argument.  (*See generally* ECF No. 281.)  The Court

agrees with Defendants' argument.

The Supreme Court has ruled that punitive damages are not available under Title II of the

ADA or Section 504 of the Rehabilitation Act.  *Barnes v. Gorman*, 536 U.S. 181, 189 (2002)

("Because punitive damages may not be awarded in private suits brought under Title VI of the

1964 Civil Rights Act, it follows that they may not be awarded in suits brought under [Section]

202 of the ADA and [Section 504] of the Rehabilitation Act.").  Because punitive damages are

not available under Title VI of the 1964 Civil Rights Act, they are also not available under Title

IX.  *Mercer v. Duke Univ.*, 401 F.3d 199, 202 (4th Cir. 2005) ("Because Title IX is interpreted

consistently with Title VI, the Supreme Court's decision in *Barnes* compelled us to vacate [the

plaintiff's] punitive damage award.") (citation omitted).

## IV.     CONCLUSION

Based on the foregoing, the Court:

(1)     GRANTS, in part, and DENIES, in part, Defendants' motion for summary

judgment (ECF No. 254), to wit, the Court:

(i)     GRANTS Defendants' motion for summary judgment as to:

(A)     Plaintiffs MAP and Skinner's ADA and Rehabilitation Act claims

(ECF No. 300 ¶¶ 189-204);

(ii)     DENIES Defendants' motion for summary judgment as to:

     (A)  Plaintiffs BPS, K. Stewart, and J. Stewart's Title IX claim (ECF

No. 301 ¶¶ 155-165);

     (B)  Plaintiffs BPS, K. Stewart, and J. Stewart's ADA and

Rehabilitation Act claims (ECF No. 301 ¶¶ 166-181);

     (C)  Plaintiffs MAP and Skinner's Title IX claim (ECF No. 300 ¶¶ 178-

188);

   (2)  DIRECTS that the following claims will proceed to trial:

     (i)  Plaintiffs BPS, K. Stewart, and J. Stewart's Title IX claim (ECF No. 301

¶¶ 155-165);

     (ii)  Plaintiffs BPS, K. Stewart, and J. Stewart's ADA and Rehabilitation Act

claims (ECF No. 301 ¶¶ 166-181);

     (iii)  Plaintiffs MAP and Skinner's Title IX claim (ECF No. 300 ¶¶ 178-188);

and

   (3)  DENIES and DISMISSES Plaintiffs' request for punitive damages on their Title

IX, ADA, and Rehabilitation Act claims.

   Dated this 16th day of September, 2015.

        BY THE COURT:

        _____

        RAYMOND P. MOORE
        United States District Judge